THE STATE v. MCLAUGHLIN, Appellant.

Division Two, March 28, 1899.

1. **Practice**: OBJECTION: IRRELEVANT AND IMMATERIAL. An objection that the fact sought by a question is irrelevant and immaterial, is equivalent to no objection.

2. ———: ———: SHOT THROUGH HEART. It is competent to ask a medical expert his opinion as to how far a man could walk after receiving a bullet which passed through his heart. It is a matter pertaining to the effect of a wound upon a vital organ, and justly falls within the domain of the expert knowledge of physicians and surgeons.

3. **Murder**: RES GESTAE. It was proper as a part of the *res gestae* for a witness to testify that he saw a man go to the prostrate body of the deceased and heard him say to those near by, "I am gone to hell anyway, but I want you boys to come back and see that he had a knife," although he did not recognize the defendant as the speaker.

4. ———: EVIDENCE: IRREGULARITY IN ADMITTING GARMENTS. Whatever irregularity may be committed in permitting a garment which deceased wore at the time of his death, to be introduced in evidence before it is shown that it has remained in the same condition since the homicide, may be cured by a cross-examination eliciting such fact.

5. ———: EXAMINATION OF DEFENDANT: PREVIOUS QUARREL. Where the defense is self-defense, and the defendant stated on direct examination that there was no quarrel or difficulty in the "dive" preceding the killing, it is not improper on cross-examination to ask him if he hadn't had a quarrel with deceased and if he hadn't flourished a pistol around. Such a question was proper as tending to test the credibility of defendant's testimony.

State v. McLaughlin.

6. ———: FLIGHT: CROSS-EXAMINATION. Where the defendant opened up the story of his flight and attempt to escape, by a protestation of his willingness to stand trial and by a statement that he had voluntarily surrendered, the State is entitled to show the real facts by cross-examination. But such protestation and statement by defendant, are self-serving and irrelevant.

7. ———: EVIDENCE: CONDUCT OF WITNESS. The State is entitled on cross-examination to compel a witness to disclose his close association with the employer of defendant, and the witness's flight to another county, after the killing, even though he had not been subpoenaed by the State.

8. ———: ———: MOTIVE: FRIENDLY ATTITUDE OF WITNESS. It is proper to ask a witness such questions as show him to be friendly or unfriendly to deceased's father, if such questions develop the motive for his testimony.

9. Practice: EVIDENCE: IMPEACHMENT. Witnesses are not incompetent to testify concerning the reputation of another for truth, veracity and morality simply because they have known him for only six or eight months. If he has resided in the same town with them and been in business there, he has acquired such a general reputation as will enable the community to form a just estimate of his character.

10. ———: ———: ———: RESIDENCE. Nor is it necessary that the witness reside in the same town with the impeaching witness in order for that witness to testify what his reputation is in that town.

11. ———: ———: ———: CROSS-EXAMINATION. When a witness is called to sustain or attack the reputation of another witness, the opposite party may cross-examine him liberally as to his means of knowledge, and test his own truthfulness, and it is largely within the discretion of the trial court to decide how far such examination shall be extended.

12. Murder: EVIDENCE: WILLFULLNESS, ETC. It is not essential to conviction that willfullness, premeditation and malice aforethought be proven by what is termed direct evidence. Like any other fact, they may each be established by the facts and circumstances attending the homicide.

13. ———: ———: FLIGHT: REQUISITION. The mere fact that defendant sometime after the homicide in a distant State surrenders to the sheriff without requisition, does not rebut the presumption arising from his conduct and flight prior to that time.

*Appeal from Caldwell Circuit Court.*—HON. E. J. BROADDUS, Judge.

AFFIRMED.

CROSBY JOHNSON for appellant.

(1) It was error to allow Miller's vest to be exhibited to the jury, without proof showing that it was in same condition as when taken from his body.    State v. Moxley, 102 Mo. 387; State v. Buchler, 103 Mo. 208.    (2) It was error to allow the State on cross-examination of McLaughlin to inquire as to matters in no manner referred to in the direct examination. State v. McGraw, 74 Mo. 573; State v. McLaughlin, 76 Mo. 320; R. S. 1889, sec. 4218.    (3) It was error to allow the State in cross-examination of defendant's witnesses to lug in matters foreign to the case, and designed to create prejudice against defendant and his witnesses.    State v. Lewis, 118 Mo. 79; Ephland v. Railroad, 57 Mo. App. 162.    (4) It was error to allow witnesses to testify that the reputation of Dunham was bad for truth and morality in Gallatin and Breckenridge, when he never had resided in those places. Waddingham v. Hulett, 92 Mo. 528; State v. Parker, 96 Mo. 382.    (5) Where A. is on trial for murder, and he testifies in his own behalf, and his reputation for truth and veracity is assailed by the State, and he calls B. as a witness to support his reputation in that regard, it is error to allow the State, under guise of cross-examining B. to inquire whether he had not heard that A. had beaten his wife, or sold liquors illegally, or been convicted of gambling, since these matters do not go to show that his reputation for truth is bad, while they tend to arouse animosity and prejudice in the jury. Ephland v. Railroad, 57 Mo. App. 162; State v. Lewis, 118 Mo. 79.    (6) Where on the trial of a murder case, B. is a witness for the defense, and the State assails B.'s reputation for truth and veracity, and C. is called to support his reputa-

tion in that regard, it is error to allow the State, under the pretense of cross-examining C., to inquire whether he had not heard B. sold liquor illegally, and had had trouble over a woman other than his wife, and had aided in beating a man out of the sale of his horse. State v. Coffey, 44 Mo. App. 455; State v. Gibley, 131 Mo. 579. (7) The State's second instruction is wrong because the jury are therein referred to the indictment to ascertain the issues of the case. State v. McCaskey, 104 Mo. 644; State v. Scott, 109 Mo. 226. (8) The State's third instruction is wrong, because it tells the jury to convict if they can satisfactorily and reasonably infer willfullness, etc., from the facts of the case; thereby prescribing a false standard as to the weight and conclusiveness of the evidence. State v. Woolard, 111 Mo. 248; State v. Taylor, 111 Mo. 538; State v. David, 131 Mo. 380. (9) The State's sixth instruction is erroneous, and is in conflict with the third and fourth given for the defendant. Flight raises no presumption of guilt, unless it arises from a consciousness of guilt and is to escape arrest. State v. Fairlamb, 121 Mo. 137; State v. MaFoo, 110 Mo. 7. (10) The State's eleventh instruction is erroneous, in that it fails to tell the jury they should acquit, if there is a reasonable doubt. State v. Sacre, 141 Mo. 64; State v. Robinson, 117 Mo. 469.

EDWARD C. CROW, Attorney-General, and SAM B. JEFFRIES, Assistant Attorney-General, for the State.

GANTT, P. J.—The defendant was indicted at the July term, 1897, of the circuit court of Caldwell county for the murder of John Miller in said county on the second day of May, 1897.

Defendant was duly arraigned and entered his plea of not guilty. The cause was tried on the twenty-second day of March, 1898, and resulted in a verdict of guilty of murder in the second degree, and assessing his punishment at ten

State v. McLaughlin.

years' imprisonment in the penitentiary.    Motions for new trial and in arrest were duly filed, heard and overruled.    Defendant appeals to this court.

Counsel for defendant has presented an elaborate brief, in addition to his oral argument.

The facts are not intricate or much complicated.

James Dunham at and before the homicide was the proprietor of an establishment in the town of Breckenridge, denominated by all the witnesses as "a dive," a term synonymous with an unlawful gambling and liquor establishment. Dunham was residing at Nettleton, another town near by, and defendant McLaughlin was running the dive for Dunham.    John Miller the deceased was a farmer about twenty-one years old and lived about two miles south of Nettleton.

On Saturday night, May 1, 1897, John Miller came to Breckenridge and about eleven o'clock that night visited Dunham's dive, and remained there from that time on until four o'clock Sunday morning.    About this hour all the parties in the dive left, and the defendant closed the dive.    The whole crowd, consisting of Dunham, Miller the deceased, Bales a farm hand of Miller's up to that time, Knight, Lundy, Scott and defendant, started to the restaurant of Arthur Richardson to get a lunch.    The restaurant was in the same block with Dunham's dive and about fifty feet distant therefrom. The party having reached the restaurant, Dunham knocked on the door or rattled it, to arouse Richardson.    While he was thus engaged, Miller, the deceased, and defendant got into a scuffle.    Various accounts are given of the details of this scuffle.

Knight who was standing by Dunham at the restaurant door, says he merely heard the scuffle and was not particularly attracted until he heard a revolver fired, when he turned and looked and saw Miller throw up his hands towards his breast and run towards witness and the others, and heard him exclaim "boys, they have done me," or "boys they have got me,"

State v. McLaughlin.

and defendant said "boys I had to do it, or I done it in self-defense." This witness immediately ran across the street and told T. A. Price that Miller was killed. He heard none of the conversation between deceased and defendant during the scuffle. He says they moved off some distance on the sidewalk during the scuffle.

Price immediately dressed and went across the street, with Doctor Ennis and found the body of deceased entirely alone. Deceased was dead, with a bullet wound in his heart. He was lying on his back, left arm down by his side, and the right arm folded across his breast, and a large knife, with a metal handle and a hawk bill, lying on his body. While dressing he saw a man walk toward the prostrate body. He and Doc Ennis reached it together, and just then he heard some one driving away.

The subsequent evidence of defendant himself was to the effect that after he had shot and killed Miller, he went to his body and saw he had a knife in his hand and he compelled Scott to come up and see the knife; that he took the knife by the blade and held it up so Scott could see it. He then says he jumped into Dunham's vehicle and drove eleven and one-half miles to his father's near Catawba, and then drove on to St. Joseph. He remained there in seclusion until Tuesday evening and went from there to Humboldt, Kansas. Remained there about two weeks and went to Tecumseh, Nebraska, and after a week went to Hebron, Utah, where he was arrested and brought back to Missouri for trial, waiving a warrant from the Governor of Utah.

The defendant relied on self-defense. He testified, that when he came up to the crowd at the restaurant Miller caught him by the arm and gave him a jerk. When he undertook to free himself from Miller's grasp, Miller caught him by the other arm and threw his foot behind him, as if to throw him down. He caught hold of Miller then, and a struggle ensued, in which Miller was thrown down on the walk.

State v. McLaughlin.

Miller then grabbed McLaughlin's throat.   The latter caught his arms and pressed them down by his side.   Up to this time but little had been said.   When Miller first took hold of him, McLaughlin begged to be let alone, as he was tired and did not want to tussle.   While McLaughlin had him down on the walk, he began to suspect that Miller was angry about something and he remarked to him:   "You are not hot, are you?   I am not mad, and don't want any fuss with you." Miller gave back no answer.   He let Miller up.   As soon as Miller regained his feet, he struck the defendant with his fist.   McLaughlin was to the east of him.   Although dawn had begun to lighten the eastern horizon to a small degree, McLaughlin was unable to see Miller's movements, he being to the west of him, and was unable to ward off his blows.   He was struck two or three times about the face and head, and came to the conclusion that, if he must fight or run, he would fight.   So he struck Miller and knocked him against the eastern window of the restaurant.   Miller was not knocked entirely down, but would have fallen if it had not been for the support the building gave him.   While Miller was half dazed by the blow, McLaughlin stepped to the west of Miller and of the crowd and who were gathered about the door.   As soon as Miller had rallied a little he rushed at McLaughlin again, but defendant warded him off and struck him so as to stagger him.   He says he could see Miller didn't have a gun but he saw him with his hands before him as if trying to open a knife.   At this defendant drew his pistol down on deceased and said, "Now stop or I will shoot you."   Miller replied, "You will you son-of-a-bitch!"   He advanced and struck at defendant over the pistol and defendant dodged the lick.   He continued his account as follows: "After he struck the second time with the knife he dropped his hands down in this shape (indicating to the jury), and I thought he was going to aim to hit me in the belly or abdomen, and as I was stepping back he came up and kicked me on the shin bone and

thigh, which numbed my leg. After he kicked me the second time in the thigh I felt myself falling, and I stepped back and caught my heel, probably in the boards of the walk, they were rough there. Anyway, I felt myself falling and I tried to catch on my hands and did catch on my hands; and when my weight was on my hands Miller steps at me with his hands in this shape (indicating a hand clutching a knife). I could see the blade in his hands. When I felt myself falling and saw him with his hands in this shape, I threw the pistol back and aimed to shoot as close to him as possible; aimed to stop him. As soon as I fired he threw his hands with the knife down. I struck him somewhere along here (indicating on his person), and he turned and walked towards where the boys were and he says, when he got there: "Boys he got me," or "say boys, he shot me," I don't know which. Someone came out in front and says, "You are not hurt; you are not shot." And he says: "I am," and fell. When I came up to where the other boys were standing, someone spoke to me and says: "John, you have played hell now." I think it was Jim Dunham. I says: "I couldn't help it, boys, he was striking at me with a knife. I had to do it."

No witness corroborates the story that defendant was down at any time during the difficulty. The evidence was quite conclusive that the deceased never owned or carried the knife found on his body after his death and there was considerable evidence tending to show it was a knife kept in the dive of which defendant was the keeper for Dunham.

There were many contradictions as to what was said and done, all of which was a matter for the jury in passing on the facts and credibility of witnesses.

The court instructed on murder in the second degree, manslaughter in the third, and self-defense, good character, reasonable doubt, and presumption arising from flight.

Numerous errors are assigned and they will be considered in the order of appellant's brief.

I.   Doctor Williamson testified he was a physician and was called on the morning of May 2, to see the deceased. When he reached him he was dead.   He examined the body and found a bullet wound in the neighborhood of the junction of the fifth rib and the sternum in the region of the heart. The bullet passed through the heart.   The ball went straight in.   He was asked then his opinion as a medical man as to how far a man could walk after receiving such a wound.   To this defendant objected, because irrelevant, immaterial and incompetent.   The objection was overruled and witness answered:   "I should judge not very far, a very few steps." He said medical books laid down no rules or regulations about such matters.   It is urged that this constituted reversible error.   It is to be observed that the objection is not that the fact sought was not within medical science or that the defendant was not an expert competent to give an opinion. It is simply that the question was irrelevant and immaterial, which is equivalent to no objection.   Now, if not otherwise incompetent, it was a material and pertinent inquiry as to how far a man could ordinarily walk after being shot through the heart.

While it can not be said in the light of medical experience that a shot through the heart always produces sudden death, yet such is the usual result and a medical man may so testify.   Messrs. Wharton and Stille in their Medical Jurisprudence, third volume, section 390, state this is the experience of the profession on this question, adding some cases which are deemed exceptional to the general rule.   The objection was not made in this case that the information sought was so general that an ordinary juror could form his opinion on the subject as readily as an expert.

As it is a matter pertaining to the effect of a wound upon a vital organ, we think it justly falls within the domain of expert knowledge by physicians and surgeons and we see no objection to proving the general effect as was shown in

this case.    Of course no sensible physician would undertake to state the exact number of minutes or seconds a man would live after such a wound but to state as Dr. Williamson did that he would "judge he could not go very far, or a very few steps," is merely giving the general opinion of the profession, and it is certainly not reversible error.

II.    The evidence of witness Price, that while he was dressing, after hearing the shot and looking out of the window, he saw a man go to the prostrate body of deceased and heard this man say, "I am gone to hell any way, but I want you boys to come back and see that he had a knife," was entirely competent and material.    Merely because he did not recognize the voice of defendant or know him when he saw him, in no manner disqualified him to tell what he heard and saw of the *res gestae* as this fact clearly was.    When shown as it was afterwards that defendant went to the dead body of Miller and uttered substantially similar or the same words it became very strong evidence in the case for some purposes.

III.    Regularly and properly the circuit court should have required the State to show that the vest of John Miller which he wore at the time he was shot, was in the same condition in which it was when the ball entered it, but the defendant examined the father fully on that subject and elicited the fact that it was unchanged in condition and that it had been kept locked up.    Whatever irregularity had crept into the case on this account was fully cured by defendant.

IV.    There was moreover no error in showing the knife which was found on the body of the deceased when shot.    It was a fact which the jury could consider.    The anxiety of the defendant on the night of the homicide to show the large knife on the body of the deceased, and the very strong evidence that deceased did not own such a knife and had never been seen with it in his possession, made it material to show that the only knife he had been known to carry was the small penknife, and that was unopened in his pocket when he was killed.

V.   There was no error in excluding defendant's reasons for his action in compelling the mute Scott to witness his picking up the knife from the prostrate form of the deceased. His purpose was manifest, and if not, it was his acts, not his reasons, that the jury were to consider.

VI.   When defendant was testifying in his own behalf he stated he was in Dunham's place the night of the homicide and that Lundy, Knight, Duke Scott, Wm. Bales, James Dunham and deceased were in there; that he quit work about 12 o'clock, and laid down on the table.

On cross-examination he was asked "what business he was engaged in there?" The defendant's counsel did not object that it was improper cross-examination, but merely that it was immaterial.   Certainly having stated he was at work, it was no stretch of cross-examination to inquire what kind of work or business he was doing.   Again he was asked on direct examination if any quarrel or difficulty took place in that dive that night and he said none.   He was asked on cross-examination if he didn't have a quarrel with deceased and if he didn't flourish the pistol around.   We think this unquestionably legitimate cross-examination.

The purpose of all cross-examination is to test the truth of the evidence in chief, and evidence which will not stand this test is not worthy of credence.   Having tendered the issue of quarrel or no quarrel, defendant can not complain if he was closely questioned upon that issue.

Equally unobjectionable were the questions as to his waiting on the customers that night and attending to business for Dunham and the playing of cards in that place. Defendant had testified and so had Dunham that defendant was running the dive for Dunham and defendant accounted for his flight on the ground that he was afraid of indictments for this work. The questions asked and objected to elicited these facts and no more.   It may be said they were not controverted facts in the case and if odium attached to defendant because

of his occupation it was just.   If in endeavoring to develop the case the prosecuting attorney also alluded to these facts he did not overstep the proprieties of the case.

VIII.   As to Dunham and Knight playing cards, no objection whatever was made to the proof of that fact, nor to the fact that defendant put the revolver in his pocket when he left the dive that night.

IX.   Defendant testified that he saw deceased opening his knife and he was then eight or ten feet distant from the other four companions. He was asked if he called their attention to the fact of his drawing his knife.   Objection was made that this was immaterial, and the court overruled it and defendant answered that he did not call their attention to the knife.   We see no objection to this.   Whether deceased drew his knife or had one was a question to be determined, and the whole conduct of defendant and deceased was for the scrutiny of the jury.

X.   Defendant in answer to a question by his counsel testified that he came back voluntarily with the sheriff without any requisition papers to stand his trial.   He also testified to showing certain bruises on his leg to his father's family and to John Buell at St. Joseph.   On cross-examination counsel for the State elicited the fact that defendant immediately after shooting deceased jumped in Dunham's buggy and drove to his father's house some eleven and one-half miles distant, that he went that same day to St. Joseph, remained there in seclusion a day, and then went to Humboldt, Kansas. A week later he went on to Tecumseh, Nebraska, and finally landed in Utah.   He was arrested there and had a trial before a justice who discharged him upon a telegram purporting to be from the Governor of Missouri to the effect that he was not wanted.   Upon his discharge, defendant left Hebron and went twenty-five miles further to Oakley, Utah.   He was arrested near Oakley and handcuffed and brought back.

This was legitimate cross-examination to rebut the claim that defendant voluntarily gave himself up.    We do not see how it could have been more pertinent.

The defendant opened up the story of his flight and attempt to escape, by his protestation of his willingness to stand trial and his statement that he voluntarily gave himself up, and the State was entitled to show the real facts to the jury.    The evidence in chief was self-serving and irrelevant. [State v. Taylor, 134 Mo. 109; State v. Smith, 114 Mo. 406.]

XI.    The State had a perfect right to compel Bales to disclose his close association with Dunham from the time of the killing of his employer John Miller.    It was most significant conduct, and it needed no subpoena to disclose his flight to Vernon county.    He was a witness and the State had a right to probe into the motives underlying his very peculiar conduct.

XII.    William McCarty was introduced to show that the father of deceased, Mr. Alexander Miller, had said to him in November prior to the trial, when told by witness he ought to have a knife to prune his trees, "that he had a pruning knife and John (the deceased) had carried it off and I guess they have it at Kingston."    He was asked if he and Alex. Miller had not had some trouble, and he answered "he acted a rascal with me."    Further inquiry developed that this witness had not paid all of his rent to Alex. Miller.    It has always been held competent to inquire whether a witness is friendly or unfriendly.    The questions put to this witness simply developed the motive for his testimony.

XIII.    The next assignment is based on the impeachment of the character of Dunham, a witness for defendant, by Brosius, Jordin and Cox.

The objection now urged is that the witnesses were incompetent to testify as to the general reputation of Dunham at Nettleton, where defendant insists he has lived for twenty years, but no such objection was offered on the trial.    The

witnesses, Brosius and Jordin lived at Gallatin, and testified that about one year and a half before the trial Dunham was in business in Gallatin for six or eight months. His wife was there a portion of the time. He was asked what his general reputation for truth, veracity and morality was in that community and the objection was made that the question called for illegal evidence, and was overruled and the witness answered that it was bad. The objection was entirely too general and indefinite but the evidence was competent. There is no rule of law, that a man must reside a lifetime in a community before he can establish a character. Defendant had resided in Gallatin for eight months and conducted a business there which would enable the business community and public to form its estimate of his truthfulness or untruthfulness, and general moral standing. In State v. Pettit, 119 Mo. 410, this court held that there was no rule of law by which the length of time is or can be definitely fixed in which knowledge of a man's character may be acquired. It is not at all unreasonable that a man may in eight months establish a reputation for immorality and falsehood in a community in which he resides and conducts a business. [1 Greenl. on Ev., sec. 461.] No error was committed in receiving the evidence.

Kenower's testimony was without question competent. It related to a knowledge of Dunham's reputation in the neighborhood in which Dunham lived, and in the town in which Dunham was shown to run the dive so prominent in the evidence. The witness was the editor of a paper in Breckenridge, and it was not necessary he should live in Nettleton only five miles distant to know what people there generally said about Dunham.

XIV. A point is made in the cross-examination of the witness Arms, who testified that Dunham's reputation for truth was good at Nettleton. On cross-examination he stated he had never heard anything against Dunham. He was asked if he had never heard Dunham kept an unlawful dive

in Breckenridge. He answered he had, and that he had heard he was selling liquor illegally. He was asked if he had not heard of various other disreputable transactions of Dunham's, and answered that he had heard of some, and had not of others. The objection to this cross-examination was that it was incompetent and irrelevant, an objection insufficient if the evidence is admissible for any purpose. But it is settled law that when a witness is called to sustain or attack the reputation of another witness, the opposite party may cross-examine him liberally as to his means of knowledge, and test his own truthfulness, and it is largely a matter of discretion with the court how far such an examination shall be allowed. We think it would be an unwise exercise of our appellate jurisdiction to reverse a cause on this showing alone. [State v. Crow, 107 Mo. 341.]

XV. The foregoing ruling must also dispose of the exception to the cross-examination of the same witness as to the reputation of the defendant himself.

XVI. We have considered the seventeenth assignment, which seems to be an *omnium gatherum* of small points, and find no reversible error in them. No good purpose can be subserved by discussing each at length.

XVII. The second instruction for the State correctly declared the law to be that if the jury were satisfied beyond a reasonable doubt from all the facts and circumstances proven in the case, that the defendant was guilty of the crime charged in the indictment, then it was their duty to find him guilty, whether any motive for the deed was apparent or not. [State v. David, 131 Mo. 380.] The mere allusion to "the charge in the indictment" in this instruction does not vitiate it. The jury had just been fully charged as to the crime and all its essentials in the preceding instruction. [State v. Scott, 109 Mo. 226.]

XVIII. The third instruction was not erroneous. It is a correct exposition of the law. It is not essential to a conviction that willfulness, premeditation and malice aforethought shall be proven by what is termed direct evidence. Like any other fact, they may each be established by the facts and circumstances attending the homicide. As to the omission to repeat "reasonable doubt" in the instruction, we have repeatedly ruled it is not necessary to incorporate it in each instruction. The court again and again declared to the jury that they must acquit the defendant if they had a reasonable doubt of his guilt, and gave him the full benefit of the presumption of innocence.

XIX. The sixth instruction for the State on the presumption arising from flight was properly given. We doubt if the history of criminal law presents a stronger case for its application. The flight was instantaneous after the shooting, and was continued until defendant reached a mining camp in Utah. The pretense of fear of a mob or running from an indictment for keeping a dive, does not account for his conduct. There was no error in refusing defendant's seventeenth request. The mere fact that he afterwards surrendered to the sheriff without a requisition did not rebut the presumption arising from his conduct previous to that time. The nineteenth instruction asked by defendant did not declare the law correctly, nor state the presumption which the law raises. There were no facts upon which to base a fear of mob violence, or fear of prosecution for selling liquor unlawfully.

XX. The eleventh instruction for the State and the first and second instructions for defendant fully cover the law as to reasonable doubt and presumption of innocence, and are altogether harmonious and consistent.

XXI. The court most properly refused defendant's thirteenth request. Had it been given the jury must have found defendant guilty of murder in the first degree, a crime with which he was not charged or on trial, or acquitted him.

State v. McLaughlin.

XXII.   The court committed no error in refusing the eleventh, twelfth and fourteenth instructions.   The court had restricted the jury to the trial of defendant for homicide.   No instruction permitted them to find him guilty of selling liquor unlawfully, and having instructed fully upon the case in hand it was not error to refuse to go through the whole category of crimes and tell the jury specifically they could not convict of them.   Twenty-five instructions on one simple proposition is surely enough.

XXIII.   The twenty-fifth assignment of error tenders the question of the guilt or innocence of the defendant on the weight of the evidence.   The argument of each and every one of these facts was doubtless made to the jury and the fact found against defendant.   There was ample evidence that defendant intentionally killed deceased by shooting him in a vital part with a deadly weapon.   The plea of self-defense was interposed and there were many circumstances which justified the jury in holding that the defendant had no reasonable cause to apprehend death or any great bodily harm from deceased. The facts attending the finding of the knife on the body of deceased well warranted the jury in finding that it was an afterthought, and that it was not in the hands of deceased when he was killed.

We think the verdict is justified by the testimony, of which the jury were, under our Constitution and laws, the judges.   We find no reversible error in the record, and affirm the judgment.   SHERWOOD and BURGESS, JJ., concur.