## THE STATE v. DUNN, Appellant.

### Division Two, December 23, 1903.

1. **Hypothetical Question:** ASSUMPTION OF FACT: TESTIMONY OF DEFENDANT. An expert can not be asked his opinion on a hypothesis having no foundation in the evidence. But the jury must determine the truth of any fact testified to before them, whether testified to by the defendant on trial or any other witness, and a ruling that facts testified to by defendant can not be made the basis of a hypothetical question can not be sustained. But if the court, nevertheless, reverses itself on that ruling, and permits an inquiry as to defendant's insanity based on defendant's statement of his condition as a result of lead-poisoning, the judgment will not be reversed, for thereby the court corrected its own error.

2. ———: INSANITY. A defendant can not be sane up to the very moment of firing the deadly shot, insane when he fires it, and sane immediately afterwards. The doctrine of "uncontrollable impulse" is repudiated.

3. ———: ———: FACTS IN CASE. Defendant was sane enough to make contracts for painting houses on both Saturday and Sunday prior to the homicide about 8:30 o'clock on Sunday evening, without giving any indications of aberration; sane enough to keep the score of a baseball game at five o'clock that afternoon; sane enough at eight o'clock to point out the defects in a revolver he had been trying to purchase; sane enough to question the authority of an officer to arrest him at that time, and to threaten to kill him for striking him for resisting arrest, and when released, sane enough to go to his boarding-house, get a shotgun, load it and start out to hunt for the officer and deceased; and sane enough to discriminate in favor of several persons he met as not being the persons he was hunting; and sane enough, a moment after he had killed a man whom he had often threatened to kill, and who was a brother of the man with whom he had provoked a difficulty when he was first arrested, to beg the friends of the murdered man not to kill him, and to ascribe his act to the fault of the officer who had arrested him. *Held,* that the testimony of an expert who testified, notwithstanding there was an absence of all symptoms which he said should be present to enable him to diagnose defendant's condition as chronic lead-poisoning, that, nevertheless, if he was not intoxicated, defendant's condition showed temporary aberration at the very moment of the homicide due to lead-poisoning, is not regarded with respect.

4. ——: ——: SELF-SERVING STATEMENT. It was not error to strike out the testimony of a physician that defendant had a few days prior to the homicide told him that he believed he was going crazy. That was a self-serving statement, and not a part of the *res gestae.*

5. Homicide: MOTIVE. It is not necessary for the State to prove a motive for the homicide.

6. ——: REMARKS OF COUNSEL: MOTIVE. A witness had testified that he had had trouble with deceased and his brother, and that defendant had sided with him, and had stated that if ever either of those men crossed his path he would kill them, and when the witness was asked to explain the details of his trouble with them the court stopped him, and the attorney for the State, being met with the charge by defendant's counsel that no motive had been shown, stated in his argument: "There was some mysterious feeling of jealousy between defendant and deceased which under the law the State was not permitted to show." *Held,* that this remark, in view of the circumstances, was not error, since it clearly referred to the State's inability to show a motive for the homicide.

7. ——: REOPENING CASE. It is within the discretion of the court to reopen the case and permit counsel for the State to introduce evidence of which he had heard after the State had rested in chief.

Appeal from Buchanan Criminal Court.—*Hon. B. J. Casteel,* Judge.

AFFIRMED.

*B. M. Lockwood* and *Myron S. Martin* for appellant.

(1) The trial court erred in excluding the evidence of defendant himself from the hypothetical question propounded by the defense to the expert, Dr. Dunsmore, and in not permitting the witness to answer the first hypothetical question in which were assumed material facts testified to by defendant. The rule with reference to hypothetical questions is that they may assume any material fact or facts which the evidence in the case proves, or may even tend to prove. Russ v. Railroad, 112 Mo. 45; State v. Railroad, 119 Mo. 246; Benjamin v. Railroad, 50 Mo. App. 602; Hicks v. Railroad, 124

Mo. 115.   The ruling was in direct violation of section 2637, Revised Statutes 1899, which says that, "no person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being the person on trial or examination."   The defendant in any criminal cause, by this statute, is, so far as the competency of his evidence is concerned, placed on the same basis as any other witness in any given criminal case. State v. Sanders, 106 Mo. 188; State v. Bank, 73 Mo. 592; State v. Palmer, 88 Mo. 572; State v. Patterson, 98 Mo. 283.   (2)   The court erred in excluding from defendant's hypothetical question propounded to the insanity experts the assumption that there was no motive on the part of defendant for the shooting of deceased, and the court erred in excluding the answer of the experts to the hypothetical question in which it was assumed that there was no motive for the alleged murder.   (3)   The court erred in allowing the State to reopen its case and to introduce evidence in chief over the objections of defendant.   The court in its ruling on this point admits that the evidence was not by way of rebuttal but that it was evidence in chief and highly improper and prejudicial to defendant.

*Edward C. Crow,* Attorney-General, and *Bruce Barnett* for the State.

(1)   In appellant's brief the contention is made that it was a physical impossibility for defendant to shoot the deceased in the manner and by the means contended by the State and testified to by the State's witnesses. This contention can not be considered.   The appellant set up the defense of insanity, and this is tantamount to a plea of confession and avoidance.   By interposing such a defense, appellant confessed the commission of the act charged, but denied the criminality thereof, because of incapacity to entertain a criminal intent.   The

simple and single issue is *"insanus vel non."* State v. Soper, 148 Mo. 239; State v. Welsor, 117*Mo. 570; State v. Pagels, 92 Mo. 300. (2) There is no substantial evidence in this case indicating insanity. Defendant's own expert witness, Dr. Dunsmore, testified that from his examination of defendant, made after the killing, he found defendant's mind to be in sound condition. An effort was made by the defense to show peculiar acts on the part of defendant during the week preceding the date of the killing, but the acts shown were too slight to be considered even as evidence tending to show or indicate insanity. In answer to a hypothetical question, the expert witness testified that, provided the person described in the question was not intoxicated at the time, he believed he was insane, the disease of lead-poisoning culminating just at that time, and that this could be true although the party was sane up to that time and recovered immediately thereafter. This court has refused to indorse this doctrine that a party may be *non compos mentis* just at the time of commission of an offense, though sane just before and just after the time. State v. Soper, 148 Mo. 237; State v. Levelle, 34 So. Ca. 131. (3) The state of rage which the defendant was in at the time of the commission of the offense and immediately prior thereto was, no doubt, attributed by the jury to the fact that he was intoxicated. There was ample evidence to justify the jury in believing that he was under the influence of liquor at the time, and this court will not review the evidence upon this point, nor attempt to determine the weight thereof, the finding of the jury thereon being final. State v. Franke, 158 Mo. 589. (4) The court committed no error in permitting the State to reopen its case and introduce evidence in chief out of the regular order and after the close of the defendant's testimony. Such matters are discretionary with the trial court. State v. Warton, 139 Mo. 526.

GANTT, P. J.—This is an appeal from a conviction of murder in the first degree.                                 ·₁

The defendant was indicted in the criminal court of Buchanan county for the murder of Alfred M. Fenton on the 20th day of July, 1902.

The indictment is sufficient and in the ordinary form. It is not questioned by defendant. The facts out of which this prosecution grew are in substance as follows:

On the night of the homicide the defendant was in Rushville, a town in Buchanan county. About eight o'clock he was in conversation with Hally Conrad, Wez Yazel, Hally Chitwood, Luther Moberly and perhaps other young men of that town about thirty or forty feet from Dr. Culver's drugstore, in said village. Jeff Fenton, a brother of the deceased, was walking along the street, and as he approached the above mentioned group of young men, the defendant was swinging a 38 Colt's revolver on his finger, and turning to Jeff Fenton said, "Hold on a minute; wait a minute and take a drink with me." Fenton replied he didn't care to take a drink, but the defendant insisted, and to prevent trouble Fenton drank with him.

After so doing, defendant pulled Jeff Fenton by the shoulder and told him he liked him and his brother Alf and would die for them; that although they had once had hard words he had since worked for them and was friendly to them now and expected to remain so. Soon, however, this friendly tone changed and he demanded to know of Jeff Fenton where his brother Alf was. Jeff attempted to excuse himself, saying he must go and take his wife and child home, to which defendant replied, "No you won't g—d d—n you, you will never take them home again," and placed his hand in his shirt bosom and started to draw his pistol, but Moberly, a deputy sheriff, stepped in and said, "Consider yourself under arrest," and at the same time took defendant's pistol

from him.   He resisted the officer and the latter called on Conrad to assist in arresting him.

In attempting to subdue defendant Moberly struck him with the revolver.   They took him to a justice of the peace, Esquire Allison.   The justice ordered him under arrest, and directed the officer to go after Jeff Fenton to make the complaint against defendant for disturbing the peace, and placed defendant in charge of Conrad and Merritt.   They, however, released the defendant, who threatened to go home and get his gun and kill both Moberly and Jeff Fenton; that he would kill Moberly if it took him a thousand years.   During the time they were at the house of Allison the justice, defendant was very violent and abusive.   Mrs. Allison begged him not to use such language, as her mother was old and infirm, and it would frighten her.

At this time defendant had his trunk at the house of Mrs. Mary Stanton, where he stayed a portion of his time, and when Conrad released him he went to Mrs. Stanton's and got his shotgun and left her house.

Returning towards the business portion of the town and carrying his gun in both hands, he met Charles Webb and Robert Page and drew the gun on them and asked who they were, and when they told him he said, "All right; go on."   Further on he halted Rev. Mr. Chapman and demanded to know who he was, and when he ascertained said, "Oh, it's the preacher, is it?" and asking to be excused, passed on down the street.

After this he stopped Virgil Morrison about opposite the home of Luther Moberly and thrust his gun in his face, but when he discovered who it was, released him, saying, "I am hunting Luther Moberly or Jeff Fenton; I don't give a damn which one it is.   I shall go and get them. I have got it in for them, and by g—d, I am going to kill them," and then started down the street.   He also stopped other citizens in the same manner, and when he found out who they were, said he was looking for Moberly or Jeff Fenton.

Finally he came to where Jeff Fenton, Holly Chitwood, A. F. Shane and others were standing. He went up to Jeff Fenton, working his gun, and said who is that? Fenton replied, "It is me, Mr. Dunn." Defendant then asked "Jeff, have you got anything against me?" to which Fenton answered, "Nothing in the world, Mr. Dunn."

After turning to the others, and finding out who they were, he said, "That is all right." About this time Alf Fenton, the deceased, Charles Sampson and Cy Fisher, drove up in a buggy. The defendant inquired of Jeff Fenton if that was not Alf's buggy, and Jeff said it looked like it. The defendant thereupon stepped out from the shade of the trees in which he was standing, and stopped the horse. He asked, is that you Alf, and Alf answered, "No," and started the horse, but the defendant stopped him again, whereupon Fisher and Sampson got out of the buggy.

The defendant asked Alf Fenton who the parties were who had jumped out of the buggy, and he told him Fisher and Sampson. He then told them to get back and Alf also requested them to do so and they did so.

The defendant then pointed his gun at Alf Fenton, placing the muzzle near to his face. And the latter caught the gun and attempted to push it away, whereupon defendant shot him twice, and Alf Fenton fell out of the buggy and was heard to say, "Oh, you have killed me. What did you do it for?" Fisher had jumped from the buggy, and he knocked Dunn, the defendant, down.

To his brother, Alf Fenton said, "Mark Dunn killed me and I don't know what he done it for; let me kill him before I die." The deputy sheriff, Moberly, came up, arrested defendant and took him away.

The defendant was not hurt, but implored those around him not to kill him, saying he had killed Alf Fenton, but that Moberly was the cause of it. The deceased was unarmed at the time he was shot.

There was an unloaded gun in the bottom of the buggy in which he, Fisher and Sampson, were riding. This gun had been obtained a little while before at the house of George Sanders, who testified it was not loaded at the time they got it and Sampson testified they had not loaded it afterwards. The body of the deceased was searched immediately after the shooting in the presence of a number of persons and no weapons found on him. The post-mortem disclosed two gunshot wounds on the body of deceased, one on the right side about an inch below the navel, from which the surgeon took ten shot. The other was in the left leg, and contained eleven shot. There was evidence tending to prove defendant was intoxicated on the evening of the homicide. Different witnesses testified to seeing him drink. Morgan says he staggered. Rev. Mr. Chapman says he was "decidedly intoxicated."

The evidence tends to show there had been a former difficulty between the Fentons and defendant. In January, 1902, which was six months prior to the killing, while on a hunt in Arkansas, he told Fred Franklin that if Alf or Jeff Fenton ever crossed his path he would kill them, and two years before he had told one Herman Yazel, in a conversation which took place in an old brick building in the village of Rushville, that if he and Alf or Jeff Fenton ever came together, he would "git him." At another time while the defendant and William Stigers were painting on the Christian church in Rushville, he told Stigers that he had had trouble with the Fentons and never wanted them to cross his path. In June, 1902, a month prior to the killing, the defendant made the remark that he would kill Alf and Jeff Fenton if they ever crossed his path, and asked Charles Van Hooser to take the Fentons to Reub Sampson's, so that he might have an opportunity to kill them and get away. At still another time the defendant said in the hearing of Norville Johnson, that Alf and Jeff Fenton had done him wrong, and he would get them and get them right,

and on the day of the killing at about eleven o'clock in the forenoon, he told this same Norville Johnson that if he should do anything the law would handle him for, it would be something they would hang him for.

The defense was that of insanity.

The defendant is about thirty-six years old, married, has a wife and one child. Was married August 25, 1901. He is a painter by trade.

For two or three weeks prior to July 20, 1902, defendant was at work at his trade painting the house of George Huff near Hall's station. His wife testified that on July 14th or thereabouts he came home sick, being unable to prosecute his work further, complaining of severe abdominal pains and pains in his head. These continued with such severity that defendant's wife and her family all became alarmed because of his complaints, condition, and peculiar acts. A physician, Dr. Jones, was called on Tuesday of the week prior to this alleged murder, and after examining defendant, pronounced him to be suffering from lead-colic and lead-poisoning. Defendant's condition remained the same, practically, without change the entire week. During this week, as he had for some time prior to this and continuously, defendant suffered from acute insomnia, being unable to sleep on an average more than three hours per night and on some nights not at all.

On Sunday morning, July 20th, after passing a restless and sleepless night, defendant arose about nine o'clock, and after eating a light breakfast, went down to the village where he spent the forenoon with several young men, among whom was Jefferson Fenton.

No trouble or incident of note occurred during the forenoon.

Defendant took dinner with Halley Conrad, at Mrs. Stanton's, Conrad's mother.

After dinner Conrad and defendant drove to the country and returned, and defendant went to a ball game on the outskirts of the village, where he acted as

score-keeper.   Alfred Fenton, the deceased, was there. There was evidence that the only drink defendant was seen to take was one taken by him after coming from the ball game at the rear end of a saloon in a vacant lot, when some twelve or more all drank from a pint bottle.

Dr. Jones, who was called to see defendant on Tuesday prior to the homicide on Sunday, found him suffering from neuralgia of the stomach which was the only symptom of lead-poisoning he observed in defendant at that time.

The physician prescribed a small tablet composed of capsicum and myrrh while at the house and followed this with a prescription of pepsin and bismuth and they had the desired effect.   Next morning defendant was so much better that no further call by the physician was required.   On Saturday defendant was at the physician's house and made a contract to paint it for him.   Defendant was perfectly rational that day.

The defendant testified he had had lead-poisoning twice before in his life, one at San Francisco, and once at St. Joseph, and recovered each time.

Dr. Jno. M. Dunsmore, of St. Joseph, an expert, a graduate of Trinity College, Canada, who had made nervous diseases a specialty for four years, testified that on the 8th of November, 1902, he examined the defendant in the jail at St. Joseph at the request of his attorneys to ascertain his mental condition; had had no previous acquaintance with defendant.   He found him to be a physically sound man; no heart lesions; no organic trouble of the lungs or any other important function of the body.   His skin was the only thing that indicated ill health.   It was yellow, but he had been in jail there for more than three months, removed from the sunlight and exercise.   He examined his mouth for a blue black mark which he had expected to find, but was unable to discover it.   As to his mental condition the defendant struck the doctor as being an intelligent, sharp, shrewd

man. He answered correctly, his memory was good, and he observed nothing in defendant to indicate anything wrong about him mentally. He then went to Rushville at a later date with one of defendant's attorneys and saw Dr. Jones and inquired as to defendant's personal history. After that investigation into his personal history he made a further investigation into his physical condition and discovered, to use his language, "a slight condition noticeable of *arterio-sclerosis,* or, in other words, it means a hardening of the arteries, which I arrived at simply by compression of some of the most superficial arteries which one could feel with the finger, and the arteries were inclined to roll beneath the finger, which indicated a hardening of the arteries or *arterio-sclerosis.*" From his examination he could not form an opinion as to the nature of the disease, if any, defendant might have suffered from. Could not form a diagnostic opinion from his personal examination. The doctor then gave a disquisition on lead-poisoning, sometimes vulgarly called "painter's colic," how it brought on indigestion, insomnia and *arterio-sclerosis* and hallucinations. Described how the system of one working with white lead, or a painter, would gradually absorb the lead, which would result in loss of appetite, followed by headache. Then follows dyspepsia, stomach troubles and costiveness. Then the blue lines on the gums appear, due to the absorption of the lead into the system. Sometimes painter's palsy or drop wrist ensues, and he finally deduced a *lead-insanity,* which is not a constant mania, but is fitful. It comes and goes; when he is removed from the lead, he comes back to himself.

A hypothetical question covering all the facts detailed in evidence, beginning with defendant's return from Huff's to the home of his father-in-law, down to and including the killing, was submitted to Dr. Dunsmore, and he was asked as to his opinion of the sanity or insanity of the prisoner at the time of the homicide.

His answer was that assuming the defendant did not take proportionally more liquor than his companions did out of the bottle from which they drank, assuming that he was not under the influence of liquor, he would answer this way: "That from the symptoms that you have given in your question I would say he was temporarily insane, but that it is not necessary that he would be continuously insane from the attack of lead-colic, but it would by my impression that at the time he was mentally aberrated, provided always he had not sufficient liquor in him to make him intoxicated.

"The exciting cause would simply be the condition of the brain as the result of the detrimental influences to the nerve centers at the culmination of this lead-poisoning or colic, and the cerebral symptoms coming after. The disease lying dormant there had culminated and that was the cause."

As to the blows given him by Moberly, he didn't think they were sufficient to add any other exciting cause, but they might accentuate it to a degree, to a delirious state.

On cross-examination this witness testified that he had practiced medicine five years; was in charge of a private hospital for nervous troubles; that he had only one case of lead-poisoning in this hospital; that he noticed no dyspeptic condition; did not examine defendant's urine and did not find any albumen in it, couldn't tell whether he was constipated. Did find slight sclerosis of the arteries which is common among men addicted to intoxicants and old men; saw no signs of hallucinations nor of epilepsy; no organic trouble with his heart, but a slight hypertrophy; nothing the matter with his liver or kidneys. Wouldn't say there was a distinct blue line on the gums, nothing the matter with the organs of respiration, nor vision. His examination, in a word, led him to the conclusion that the defendant was mentally sound and right.

The defendant testified in his behalf, that he

learned the occupation of painting when about fifteen years old in Iowa and St. Louis. He then served as a waiter in a hotel one winter in Kansas City. He then worked at his trade for a year or so in Kansas and Colorado, and then went to the Indian Territory and was a cowboy, and then went back to paper hanging and painting for about eighteen months. He gave that up and worked in a coal mine and hauled logs. After that in the spring of 1893 he came to St. Joseph, Missouri, and again served as a waiter awhile, and then went to painting again for a paint contractor and followed that for eighteen months. He then left St. Joseph and went south as an advertiser of Pond's Extract and Horseshoe Tobacco Company. The advertising business took him south into Texas, New Mexico, and on to California. In San Francisco in 1894, he had painter's colic and quit work there and returned to St. Joseph. Was sick about two and one-half months in San Francisco. Had cramps in his stomach, lost his appetite and became very poor in flesh, but he got well. After returning to St. Joseph he took to painting again and then went south, remaining only a short time in one place at work. He then returned to Atchison, Kansas, in 1898, and got work under a contractor and painted the Bethel schoolhouse in Buchanan county, and after that got a job at Hall's station to paint a house, and that occupied all the summer and fall. He purchased a hunting outfit and spent that winter on the bar shooting ducks and geese. In the spring worked at carpenter's trade and painting until July, 1899. He then went to Rushville to live, and from that on till this difficulty, followed house-painting for a living. While in St. Joseph had colic and cramps again and had to quit work for four or five days. Took whiskey and Jamaica ginger and lived on milk. Got well and had no more trouble till he was taken sick in San Francisco. After he went to Rushville to live he boarded with John Fenton, a brother

of deceased, and later on with Mrs. Stanton.  Remained with her until he was married in 1901.  Lived with his wife's parents awhile and then kept house about two months and broke up and took his wife to her father's house and went to Arkansas and was gone four or five months.  With him on that trip were several young men,. Fred Fenton, Ollie Jones, Jake Merritt, Holly Chitwood, Tom Harding, Fred Franklin and Burt Hudson. All the others returned home and left defendant and Franklin in the camp.

Defendant explained his conversation with Franklin on that trip.  He admitted making a threat to kill Alf Fenton, but says it was conditional that if Fenton attempted to shoot him, he would kill him.

He testified in regard to his condition during the week preceding the homicide; that he suffered extreme pain from the colic; became frightened; lost consciousness and told them to send for whiskey and Jamaica ginger; couldn't get the ginger; sent for Dr. Jones and remembers his coming, but didn't know when he left. The doctor prescribed.  Was in bed most of the week; felt better on Saturday and went to see the doctor about painting his house for him.  Has no recollection of going home Saturday night.  The first he recalls is that Sunday morning he found himself at Mrs. Stanton's; sat and read while she went to church; went up into the village, loafed around and finally went to dinner with Halley Conrad.  After dinner he and Conrad drove out to look at a piece of corn, came back and went to ball game and kept the score; head pained him so he thought he would have to get some one to take his place; after returning to town, a crowd of young men got a pint of whiskey and he took a drink out of it behind the saloon. Some one then produced a half pint and he took another drink; that morning he took a drink with deceased out of a bottle the latter offered him.  That Sunday afternoon he got a pistol from Chitwood.  He had the privilege of trying it and he got it so as to try it next

day as he went to work. That evening he was showing Jeff Fenton the pistol; telling him how it should balance on your finger, etc., when Moberly came up and told him he was under arrest. He didn't know Moberly was an officer, and resisted arrest, and Moberly struck him over the head. After that he remembered nothing of the occurrences detailed by the other witnesses leading up to and including the shooting of Alfred Fenton by defendant, until he says when he recovered consciousness, he was lying in an alley by Luther Moberly; that he found his head was bloody and inquired of Moberly how it happened, and Moberly told him he hit him over the head to keep him from shooting Jeff Fenton, and told him he had shot Alf Fenton with his shotgun, and defendant denied it. Then Gillinan came and was talking to Moberly about a team, and he learned that he was going to take defendant away. At his request Moberly took him by his home and on the way he inquired of Moberly about his shooting Alf Fenton, and Moberly told him he did, but he had to do it; that Alf drew a pistol on him and defendant had to shoot him. Moberly advised him that his only defense should be self-defense.

The court instructed on murder in the first and second degree; the law as to insanity as a defense; and drunkenness; the competency of defendant and his wife as witnesses; the credibility of witnesses, and the form of the verdict.

Other facts may be noted if deemed necessary in the course of the opinion.

I.    The first contention of defendant that it was a physical impossibility for defendant to have shot and killed deceased in the manner detailed by the State's witnesses, is without merit, independent of his plea of insanity.

The evidence disclosed that the defendant was armed with a double-barreled shotgun; that deceased was in a buggy with Cyrus Fisher and Charles Samp-

son; that defendant halted the horse and inquired if that was Alf, whereupon deceased first answered, "No," and attempted to drive on, but defendant again halted him and this time deceased then admitted that it was he. The testimony then shows that both Fisher and Sampson fled from the buggy before defendant began to fire at deceased. The evidence tends strongly to show a struggle on the part of deceased to prevent defendant shooting him.

The defendant alone was armed, with a double-barreled gun; he was seen to discharge both barrels and Alfred Fenton received two wounds at the time. Out of one the surgeon extracted eleven shot, and out of the other, ten. Without a recapitulation of all the testimony on this point, it is sufficient to say that it leaves not a reasonable doubt that defendant shot and killed Alfred Fenton as charged in the indictment.

II.    The defendant was a witness in his own behalf and testified at considerable length as to his sickness from lead-poisoning in St. Joseph and San Francisco, and during the week prior to the homicide at Rushville. He detailed his symptoms, such as excessive pains in his stomach, insomnia, want of appetite, nervousness and loss of memory, etc. Dr. Dunsmore testified as a witness for defendant. A hypothetical question based in part upon the testimony of the defendant, was propounded to him. The counsel for the State objected to the question because many of the facts assumed were not in evidence. The court did not sustain this objection, as made, but held that it was improper to the extent that it was based upon evidence given by the defendant himself, and this is urged as error by the defendant. It is obvious that the hypothetical question propounded included much that had not the slightest tendency to throw any light one way or the other upon the sanity or insanity of defendant. An expert, moreover, can not be asked his opinion on a hypothesis having no foundation in the evidence. On the other hand, as the

jury must determine the truth of any testimony offered before them, it is competent to assume as a fact matters testified to, even if controverted by other witnesses. [Russ v. Railroad, 112 Mo. 45; Smith v. Railroad, 119 Mo. 246.]

The ruling of the criminal court that the facts which the evidence of the defendant tended to prove could not be incorporated in the hypothetical question propounded to the expert can not be sustained.

Doubtless this ruling, made during the trial, was predicated upon the decision of this court in State v. Soper, 148 Mo. loc. cit. 234, wherein it was held that physicians could not give opinions touching a defendant's sanity based on statements made by him concerning his previous personal history, because such statements were hearsay; but in that case as the opinion shows these statements were not under oath, the proposition is entirely sound; but in this case, the defendant's statements were under oath and were evidence in the case.

Clearly we think they were not to be excluded merely because they were testified to by defendant.

But conceding that the facts to which defendant testified should not have been rejected solely because given in evidence by him, the further question arises whether their omission was prejudicial. In other words, were they by themselves, or in conjunction with other facts testified to by other witnesses, the basis for an opinion by an expert as to his sanity or insanity?

The defendant in substance testified that in 1893 while following his profession as a painter in the city of St. Joseph, he was seized with abdominal cramps and pains; that prior thereto he had severe headaches and suffered more or less from insomnia; that following the cramps he fell into convulsions, during which time his shoulders and head were drawn backward; that this attack was followed by sickness for five days during which he lived chiefly on milk; that he completely recovered

from that illness.   He then went into the advertising
business and in 1894 landed in San Francisco.   There
he was taken with cramps which drew him backwards.
He called in a physician who diagnosed his case as
painter's colic.   He suffered severe pains in his head
and would become unconscious.   Got very poor because
he couldn't eat.   He got well of that sickness and came
back to St. Joseph, and then went south again, and
traveled around until 1898, when he returned in the
spring to Atchison, Kansas.   After that he lived on the
river bar, and fished and hunted for a living, until he
took up his abode in Rushville, where he continued to
live until the homicide, save when on fishing trips to
Arkansas.

It is apparent from the very circumstantial account
given by defendant of his travels, occupation and places
he visited, that there was no loss of memory occasioned
by either of his sick spells.

The defendant had recovered entirely from these
sick spells and had no recurrence thereof for nearly
eight years and during that time had not followed his
trade regularly.   In two respects the evidence so far
fails to establish chronic lead-poisoning, which the ex-
perts testify may result in insanity: first, there is want-
ing that constant use or contact with the lead which
will result in lead-poisoning, and, second, it is evident
from the quick recovery in each spell, that the disease
in defendant, if at all, had not reached that stage in
which it had affected the brain, because the expert tes-
tified that when it resulted in mental affection it in-
volved the tissues of the brain; that they degenerated
and this was a permanent condition, and yet this same
expert found this defendant by actual examination to be
a bright, shrewd, intelligent man, physically and men-
tally sound and none of the indicia which he would ex-
pect in lead-poisoning present in his case, and yet it
was on his evidence alone that the defense of insanity
rested.   So far as the court excluded this evidence as

to the two attacks of sickness in St. Joseph and San Francisco from which defendant had entirely recovered as early as 1894, it can be safely asserted that they could not have formed a basis for the expert's opinion according to his own theory.

The defendant's counsel then changed his question and omitted all reference to the sickness of defendant at St. Joseph in 1893, and at San Francisco in 1894, and began with his personal history some three years prior to the homicide, and while the court had ruled he could not base his question on defendant's evidence, it is plain that he substantially stated every fact to which defendant had testified that bore even the slightest relation to his sanity or insanity.

Not only is this our conclusion from a careful reading of the hypothetical question in connection with defendant's own testimony, but such was the view of the learned judge of the criminal court, because, after a recapitulation of the facts assumed to be in evidence down to and including the arrest of defendant by Moberly, the deputy sheriff, and while he was in charge of Merritt and Conrad, the record recites that at this point, the judge said, *"Now, all this is based upon what the defendant said himself. Proceed, though, with your question."* But one construction can be placed, then, upon the court's action, and that is that while he was of opinion, as he had first ruled, that it was not competent to include in the hypothetical question facts testified to only by defendant, he had so far modified his views as to permit the question though based on defendant's evidence.

So much of the question as contains facts detailed after defendant's arrest by Moberly and after Moberly struck him, could not have been based on defendant's evidence, because he testified positively that after the lick by Moberly *everything was a blank until he recovered consciousness after the homicide and found himself*

*lying in an alley just before they took him to jail.*

So that while the court in fact announced an incorrect rule, and at first excluded the sworn statements of defendant in the framing of the hypothetical question propounded by defendant, it in effect reversed itself, and permitted so much of defendant's statement that really had any bearing on the case to be incorporated in the amended question. Our conclusion is that thus permitting defendant's statement to be made the basis of the question, the criminal court corrected its own error, and defendant has no just cause of complaint on that ground, and, moreover, it is apparent that no harm resulted to defendant anyway, because the expert testified he was insane, if not intoxicated, and he could have done no more if the first question had been allowed.

III. One other objection urged is, that the court excluded from the hypothesis of defendant that there was no motive for defendant's shooting deceased. When counsel for the State urged this objection, the court remarked there was no evidence except defendant's that there was no motive, but *"there was evidence showing there was no ill feeling."*

Mr. Martin, counsel for defendant, said: "Why, the testimony shows that these men were *the best of friends.*"

The Court: "Why, of course you have proven that fact; but as to whether there was a motive, I don't think the testimony shows that. I don't think that assumption ought to be made to the physician."

Mr. Martin: "Now, I understand that the doctor can assume that these men were close personal friends?"

The Court: "Yes, I have stated that."

After all it is but another way of assuming there was no motive. If the expert was in fact one competent to pass upon a psychological question, he certainly would assume that a man's close personal friend would

have no motive to kill him in the absence of a motive assumed in the question.   No possible injury could have resulted to defendant from substituting the words, "That the men were close personal friends," for the words, "That there was no motive for the killing."

This exception must be overruled.  To the hypothetical question thus propounded Dr. Dunsmore made this answer:

"Provided that this prisoner did not take proportionately more liquor than the others did (there being evidence that he took at least three drinks from bottles that day, and no evidence how much he took at a drink) ; that he didn't take a lion's share of the liquor, probably consuming a half pint on the two occasions—assuming that he was not under the influence of liquor; I would answer the question this way: that from the symptoms that you have given in your question I would say that I believe the man was temporarily insane, *but* that it is not necessary that he would be continuously insane from that attack of lead colic, but it would be my impression that he was mentally aberrated."

In other words, *sane* up to the very moment of firing the deadly shots, insane when he fired them, and sane immediately afterwards.   This court has on two occasions repudiated such a doctrine.   It is the doctrine of "uncontrollable impulse," which this court has expressly disapproved.   [State v. Pagels, 92 Mo. loc. cit. 317; State v. Soper, 148 Mo. loc. cit. 237; State v. Levelle, 34 So. Car. loc. cit. 131.]

And this is the only kind of insanity which could find support in this evidence.   This defendant was sane enough to make contracts for painting houses on both Saturday and Sunday, and excite no suspicion that he was "aberrated."  He was sane enough to keep the score of a baseball game up to five o'clock that afternoon.   Of sound enough mind at eight o'clock that night to point out the defects in a revolver he had been trying to purchase.   Was sane enough to question the authority of

Moberly as an officer to arrest him, and to threaten to kill Moberly for striking him and when released to go to Mrs. Stanton's and get his double-barreled gun, load it and start out to find Moberly, and sane enough to discriminate in favor of those he met when he was hunting for Moberly. Was sufficiently sane a moment after the killing to beg the friends of Alfred Fenton not to kill him, and to ascribe his act to the fault of Moberly. In view of the positive testimony of Dr. Jones and Dr. Dunsmore as to the actual mental condition of defendant when they visited him and examined him, and in view of the absence of all the symptoms which Dr. Dunsmore testified should be present to enable a physician to diagnose an ailment as chronic lead-poisoning when he examined defendant in the jail after the homicide, we are impressed with Wharton's observation in his work on Criminal Evidence (section 420) to the effect that, "When expert testimony was first introduced, it was regarded with great respect. An expert when called as a witness was viewed as a representative of the science of which he was a professor, giving impartially its conclusions. Two conditions have combined to produce a material change in this relation. In the first place, it has been discovered that no expert, no matter how learned or how incorrupt, speaks for his science as a whole. Few specialties are so small as not to be torn by factions; and often, the smaller the specialty, the bitterer and more inflaming and distorting are the animosities by which these factions are possessed. Peculiarly is this the case in matters psychological, in which there is no hypothesis so monstrous that an expert can not be found to swear to it on the stand and to defend it with vehemence when off the stand. '*Nihil tam absurde dici potest, quod non dicatur ab aliquo philosophorum.*'" [Cicero, de Div. II, 58.]

The doctor very properly qualified his opinion by assuming that defendant was not intoxicated, conceding that if intoxicated defendant's conduct could readily be

accounted for without attributing it to aberration or insanity. There was ample evidence to justify the jury in believing defendant was more or less intoxicated.

Morgan says that he staggered when he walked, and Mr. Chapman says he was ''decidedly intoxicated.''

In addition to this, he was seen and himself testified he drank three times out of bottles that day. The jury doubtless took this view of the case.

IV. As to the failure to prove a motive, it has been so often ruled that it was not necessary to do so, that it is sufficient in this point to cite some of the cases. [State v. McLaughlin, 149 Mo. 33; State v. David, 131 Mo. 380; State v. Foley, 144 Mo. 620-621.]

But in this case there was evidence of an old quarrel and threats by defendant to kill deceased and his brother if they ever crossed his path.

V. Again, it is insisted that the court erred in striking out of Dr. Jones's evidence, that defendant told him some days prior to the homicide that he (defendant) believed he was going crazy. This was a self-serving statement of defendant, no part of the *res gestae,* and a mere conclusion of defendant. It was properly excluded.

VI. During the argument, Mr. Motter, one of the counsel for the State, said, ''There was some mysterious feeling of jealousy between the defendant and Alfred Fenton, the deceased, which under the law the State was not permitted to show.'' Exception was taken to this. To appreciate this assignment it should be recalled that the State had proved by various witnesses that a feeling of enmity had existed for more than a year prior to the homicide, and when the witness William Stigers was on the stand he testified that when he and defendant were painting a church in Rushville, defendant had said that he never wanted Alf and Jeff Fenton to cross his

path.   Pressed by counsel for defendant, he stated defendant and the Fentons had had some trouble.    It was over the witness's trouble, and defendant had sided with witness, and the witness was about to state the nature of the trouble, when the court stopped him and ruled he would not permit that trouble to be shown further.    It is obvious that it was to this Mr. Motter referred.    He was combating the theory of the defense that no motive had been shown. . He was clearly within the line of legitimate argument when he stated that the court had not allowed them to go into the particulars of that old quarrel.    We think this remark did not constitute reversible error.

VII.   As to reopening the case, it was within the discretion of the court to permit counsel for the State to introduce evidence of which he had learned after the State rested in chief.    This is well settled law.

In view of the whole record, we find no reversible error.    The instructions were full and fair.    Indeed, they have not been assailed and we see no cause for interfering with the verdict of the jury.    There was ample evidence, if credited by the jury, and it was, to sustain the verdict of murder in the first degree.

The judgment is affirmed and the sentence which the law pronounces must be carried into execution, and it is so adjudged.

*Burgess* and *Fox, JJ.,* concur.