THE STATE v. FRANK M. LISTON, Appellant.

Division Two, December 20, 1926.

**LARCENY AND BURGLARY: Insufficient Evidence: Prejudice.** Where there is not a circumstance in the case that is not consistent with the theory of defendant's innocence, charged with burglary and larceny, outside the testimony of one witness, who admits convictions and penitentiary terms in four states, and has pleaded guilty to the identical crime and testifies that he has testified for the State "to get even with defendant" for having told of the witness's connection with the crime, and the defendant's reputation is shown to be good and his conduct at the time is satisfactorily explained and is consistent with his innocence, and his explanation is corroborated by the consistent testimony of other unimpeached witnesses, the verdict of guilty should be set aside on the ground that it was prompted by prejudice, passion or partiality, and a new trial granted, and if on a new trial no more substantial evidence of his guilt is produced he should be discharged.

---

Corpus Juris-Cyc. References: **Burglary,** 9 C. J., Section 132, p. 1076, n. 26 New. **Criminal Law,** 17 C. J., Section 3593, p. 256, n. 67. **Larceny,** 36 C. J., Section 483, p. 903, n. 35.

Appeal from Howard Circuit Court.—*Hon. W. A. Walker*, Judge.

REVERSED AND REMANDED.

*Frank M. Liston* for appellant.

(1) Irrelevant facts draw the minds of the jurors from the point in issue and tend to excite prejudice, and mislead. State v. Huff, 161 Mo. 459; Harper v. State, 83 Miss. 402; State v. Moore, 129 N. C. 494. (2) There may be many witnesses who give testimony which agree with an accomplice, but which, if it does not serve to identify the accused, is no corroboration of the accomplice. The danger being that the accomplice will attribute a share in the transaction to an innocent person. Roscoe, Crim. Evidence, 130; Ettinger v. Comm., 98 Pa. 338. (3) Trial courts should, on motion, determine whether the verdict is contrary to the evidence. State v. Young, 119 Mo. 495. And should grant a new trial when injustice has been done and a verdict is against the weight of the evidence or so clearly wrong that the verdict raises a presumption of prejudice, corruption or ignorance on the part of the jury. State v. Prim, 98 Mo. 368. And should grant a new trial when a verdict is based upon impeached evidence. State v. Prendible, 165 Mo. 353; State v. Rose, 142 Mo. 418. The case at bar is only a clear one of failure of proof. R. S. 1909, sec. 2021. Where there is irrelevant evidence in a criminal case it is always presumed to be prejudicial because it would naturally lead the jury to infer that such was an important feature in establishing the guilt of the accused. State v. Stone, 106 Mo. 7; State v. Smith, 259 S. W. 508; State v. Brown, 209 Mo. 413; State v. Primm, 98 Mo. 353; State v. Tevis, 234 Mo. 276; Burkette v. Gerth, 253 S. W. 199; State v. Goodale, 210 Mo. 275; State v. Weaton, 221 S. W. 26; State v. Wilson, 91 Mo. 410.

*North T. Gentry,* Attorney-General, and *A. B. Lovan,* Assistant Attorney-General, for respondent.

There was substantial evidence. The testimony of DeHart to the effect that the defendant invited and persuaded him to burglarize, coupled with the testimony of the several witnesses who saw the defendant and DeHart together on the day of the burglary, and the testimony of the witnesses who saw the defendant at the place where the stolen property was found, certainly would be called substantial evidence. The court, therefore, will not disturb the verdict on the ground of insufficient evidence. State v. Maurer, 255 Mo. 168.

HIGBEE, C.—An information was filed in the Circuit Court of Howard County on December 22, 1925, charging the defendant with burglary and grand larceny. A trial was had on January 27, 1926, resulting in a verdict finding the defendant guilty of burglary in the

second degree and assessing his punishment at imprisonment in the penitentiary for a term of eight years, and a verdict finding the defendant guilty of grand larceny as charged and assessing his punishment at imprisonment in the penitentiary for a term of four years. A motion for new trial was overruled. The court reduced the punishment for the charge of burglary from eight to five years and sentenced the defendant on the burglary charge to five years in the penitentiary and to four years in the penitentiary on the charge of grand larceny, the sentences to run concurrently. The defendant appealed.

The evidence for the State is outlined by the Attorney-General; with a few changes it is as follows:

The defendant is a negro lawyer. For about a year prior to the trial he had an office in Columbia, Missouri, and also maintained a branch office in Kansas City, Missouri. The store which was broken into was known as the New York Style Shop and was owned and operated by the Famous Style Shop, a corporation. · It was located next door to a hardware store in Fayette, Missouri. Back of the two stores there was a room which extended across both stores with no partition in it. According to the evidence, a window or transom was broken and then from the inside the door to the back room was unfastened.

On the morning of the 13th of November, 1925, the proprietor of the New York Style Shop found six or eight hundred dollars' worth of goods missing. These goods consisted of silk dresses and linen dresses and other goods of that kind. In the back room the proprietor of the hardware store had two sacks of coke. On the morning of the thirteenth it was found that this coke had been emptied and the sacks were missing. On the 14th of November a deputy sheriff and the city marshal found a trunk full of the stolen goods in Slater, Missouri, in the residence of one Bug Smith. · The officers found in this house one Romie DeHart, Bug Smith and several others, all of whom were arrested and placed in jail. A number of other persons were in the house at the time of this arrest, but ran away and escaped. The testimony further shows that this defendant, on the 13th of November, drove into Slater in company with Romie DeHart, who got S. H. Cooper to show them the way to Bug Smith's residence, where DeHart and Bug Smith carried a trunk into the house. The testimony further shows that the defendant went into the house at the time the trunk was taken into it and stayed for a while and then left. He was not in the house when the officers found the goods. The testimony further shows that on the thirteenth the defendant was seen in Boonville in company with DeHart, and that while there DeHart secured the trunk in which the goods were found by the officers at Slater.

Romie DeHart, a negro, aged twenty-six, testified for the State: I was born in Howard County and have lived here nearly all my life.

I am in jail on a charge of burglary and larceny, in connection with the charge against Liston; have pleaded guilty; am an ex-convict; have done time in Missouri, Kansas, Iowa and South Dakota; first time was at Marshall; got four years for larceny; next at Winfield, Kansas; next South Dakota; next at Sioux City, Iowa. I first met the defendant at Sioux City, June 18, 1920; saw him that night and we got arrested and he got loose and I got stuck. He wrote me a letter, postmarked at Columbia, Missouri, while I was in the Iowa penitentiary, and told me he had a job for me; that was in September; I destroyed the letter. I got out of the penitentiary October 7, 1925, and came straight to Kansas City. I went to Slater, Missouri, looking for Bug Smith; have known him all my life. I went to Boonville and stayed three weeks; learned the defendant was in Kansas City. In two or three days met him at Boonville and asked what kind of a job he had; he said he would tell me later on; he said he had to go to the Boonville courts; met him at Nannie King's that night; said he had a murder job for me. He wanted me to get diamonds mostly; nothing said about Fayette at that time; next night I saw him in his room; he told me to stick around a few days; said he had to go to Kansas City. I saw him again in Boonville a week later; that was in October; said he had a job in Columbia. I went to Columbia and saw him, and the next day we returned to Boonville. I stayed there a week. He went to Kansas City and returned to Boonville. He made another trip to Columbia. We went back to Boonville. Mrs. Williams, Mr. Wright, Miss Buckner and I were in the car; had no talk about the job; stayed at Nannie King's that night. I distributed bills to them and the other people that came; he said nothing about a stick-up job then. Next day we came to Fayette; that was the first time we came together. He told me he had been at Fayette; he said they were coming to Fayette and he wanted me to come along; next day we came to Fayette; that was the 12th; got there between four and five; we had a blow-out a block from the court house; Liston, Wright and I went to get some patches. It was getting dark. Wright went across the street and got some patches. When he was fixing the car Liston showed me the place to kick in, the Famous Style Shop. He said it was the first woman's store I came to. He told me to go in the place. I went in between nine and ten. (Here witness identified the stolen goods). After I got the stuff I took it down to Liston's car that night; I did not see him that night. We made an agreement if he had money to get gasoline he would set a lantern in his car and if the lantern was not burning to hide the stuff till the next morning. There was no light and I hid it in the corn field about a quarter of a mile. Saw Liston next morning about eight o'clock at Boggs' house; had no watch. He had not got up yet when I went down there; Mrs. Williams, Miss Buckner, Miss Wright and I were in the house; we all

ate breakfast there; Boggs was not there; Liston came out to the car about 9:30 or ten; this stuff was in the corn field. We left Boggs' place that afternoon at three or four o'clock; we left in the car; I told him where I would be; he came and stopped his car and I got the sacks; they were just off the roadway. He and I put them in the car. He had not got any gasoline. We went to Boonville to Nannie King's. Liston sent me a box to pack the goods in. I got an old trunk from Lige Taylor and we packed it. He gave Nannie a coat and a dress; then we tied the trunk and put it in the car. It was then about ten and we started for Slater about thirty miles off; got there about one P. M. We went from Boonville to Marshall. At Slater we went to Bug Smith's because Liston wanted to; said some parties were waiting for him there. Smith and I took the trunk into the kitchen. There were ten or fifteen sitting around there. Liston stayed two or three minutes. There were two Jews in there. Bug Smith and I put the trunk in the middle room. Liston and the Jews went in there about ten minutes and come out; Liston went out; said he was going to see the Baptist preacher. That is when I was arrested. I made no statement at the preliminary hearing. The next time I saw Liston was about two weeks after that up here at the prosecuting attorney's office. After Liston made his statement accusing me I pleaded guilty. I did what we agreed to do—stand pat. I stood until he turned. I was arrested on the 14th. The prosecuting attorney didn't promise me nothing. My lawyer advised me to tell the truth; the court employed my lawyer for me; he advised me to get on the stand and tell all about it in my case. I volunteered in this case. I told the prosecuting attorney a couple of days ago I wanted to get on the stand and tell; I guess my lawyer told him. I plead guilty yesterday; have not been sentenced. When Liston made a statement before the prosecuting attorney that made me mad and I am getting even with him.

The defendant testified, in substance: I have lived and practiced law at Columbia, Missouri, a little more than a year; have a branch office at Kansas City, Missouri. I first met DeHart at Boonville, Missouri. I have never been at Sioux City, Iowa. I did not write him a letter last September at Columbia, Missouri, addressed to him at the Iowa penitentiary. At that time I did not know he existed. I met him at Boonville about the last of September, 1925, at the colored hotel of Nannie King about 11:30 P. M. I was driving in a Ford car from Kansas City to Columbia and stopped for lunch. I saw some negroes and inquired if anyone cared to make a trip to Columbia. I was ill and it was cold and raining. I was gassed in the World War and can't see well at night and wanted to have somebody with me. DeHart said he could handle a Ford and would make the trip with me. We reached Columbia in about an hour. He drove. I left him

at Boggs's and loaned him a dollar to pay for his lodging. The next day he got in the car and rode with me to Boonville and I went on to Kansas City. *En route* to Columbia he told me his name was Crawford. I supposed he was one of the Boonville boys. I did not write him a letter from Columbia. He did not ask me what job I had for him. I next met DeHart at Boonville about November 11th at Nannie King's. I had no business transactions with him. He went with me to Columbia to drive the car. I went for the officers of the Loyal Legion. I took in my car Miss Buckner and Mrs. Williams, now Mrs. Wright, Isaac Wright and DeHart. We went from Columbia to Boonville to introduce and set up an order known as the Supreme Lodge Knights of the Loyal Legion and Court; had bills printed there at Mr. Cain's. We held a meeting on the night of the 11th and left Boonville on the 12th. Prior to this meeting we scattered bills. (A copy of one of these bills, Exhibit 4, was read in evidence. It was an announcement of a mass meeting to be held, on the night of November 19, by Isaac Wright, Lizzie Williams, Lena Buckner, grand officers of the Knights of the Loyal Legion, and Frank M. Liston, speaker of the day). Mrs. Wright, Miss Buckner, Mr. Wright, myself and DeHart distributed bills. I hired him. We came to Fayette, that is, Mr. and Mrs. Wright, Miss Buckner, DeHart and myself; left Boonville on the 12th about 1:30 in the afternoon for Fayette and got there between two and three o'clock. I had never been in Fayette; after the meeting was over some one suggested Fayette. We, had tire trouble near the oil station, Main Street. Mr. Wright got out to get some patches and was gone four or five minutes. DeHart got a jack and jacked up the car. Wright came back with the patch, and they took off the tire and mended it. I was inside the car. Mrs. Wright said she would get out and find where Joseph Boggs lived; DeHart got out and inquired; that was before the blow-out. The women found Boggs at the church and we proceeded to his house. While we were fixing the tire I did not show DeHart the Famous Style Shop. I didn't even know where we were; had never been there before. I didn't leave the car, nor have any conversation with DeHart except about fixing the car. I didn't then know there was such a place. We all went to Boggs's house and went in except De-Hart. I had no conversation with DeHart after we stopped at Boggs's house. I next saw DeHart the next morning at breakfast; the women asked if he would have some and he sat down. After breakfast he left, I don't know where. I saw him distributing bills. When coming to Fayette he said this was his former home. He said he wanted to come here because he had some things he wanted to move to Slater. I got in the car about three P. M. to leave for Boonville. I found a sack and a gunny sack. I made no inquiry; he had told me he had some things to move to Slater and I had agreed to take them as far

as Boonville. I left in front of Boggs's home; got to Boonville about four, and had a tire blow-out and went to Mr. Brown and got an old inner tube. I left DeHart at Nannie King's. He was trying to get some one to take him to Slater. I was gone forty-five minutes or an hour. DeHart was waiting for me at the car. I had agreed to take him to Slater by way of Marshall if he failed to get some one to take him. I had to go to Marshall to see Reverend Payne. I was an hour or more fixing the tire, and when ready to go I saw this trunk in my car. I did not give DeHart permission to put it in my car. He said it was rainy and he put those things in the trunk to keep them from getting wet; it was in the back seat. It was pretty dark when we got to Marshall. This was the night of November 13th. I stayed there till the next day, at Annie Boggs's house. DeHart took me there. She was on the witness stand. I left Marshall before noon on the 14th with DeHart and the trunk in the car; got to Slater about one. I was going to Slater to see Reverend Wright. I had never been to Slater. DeHart got out, and came back with Mr. Cooper, who directed the driving of the car to a place I learned afterwards was the residence of Bug Smith. I stopped the car there. Cooper went into the house and there was no one there. Cooper and DeHart found Bug Smith, and DeHart and Smith took the trunk into the kitchen in Bug Smith's house. I stayed there about three or four minutes, long enough to warm my hands and to inquire where the negro minister lived, Reverend Wright. Cooper told me. While I was in the house (Bug Smith's) I saw no white man, had no dealings with any one passing money. DeHart paid me a dollar. I had asked him for it before; he didn't pay me for moving him. I considered we were about even. There were two or three negroes came in the house while I was there. I drove to Rev. Wright's house. He was on the stand yesterday. I next saw DeHart at the office of the prosecuting attorney here. I believe that was November 22nd. I had been from Slater to Marshall and saw Mr. Payne, and went to Liberty and Kansas City. I was ill and under the care of Dr. Humbrick. I went to Marshall to fill a date. On Sunday I learned there was a warrant for me. I went to the sheriff and surrendered. Here the defendant denied several statements made by DeHart while on the witness stand; denied any knowledge of or complicity in the burglary.

Witness continued: The first time I saw the contents of that trunk was yesterday when they opened the trunk here. I never knew I had hauled any of the stolen goods. I didn't know the Famous Style Shop had been burglarized or that any of the goods were in my car. I first learned of the burglary over in the Howard County jail. After I made a bond I made a detailed statement of my connection with the things in the trunk to Mr. Burton, the prosecuting attorney, in the presence of Mr. Bagby. I told him I hauled that trunk. (The state-

ment was in accord with his evidence). In 1920 I was United States Railway mail clerk in the post office at Washington, D. C. I left Washington, as near as I can remember, April, 1921. I was on inactive duty and was sent to Indiana for hospital treatment and arrived there some time in April, as near as I remember.

Liston was corroborated as to the purpose of the trip to Fayette on November 12th, and the repair of the tire, by Mrs. Williams and other grand officers of the society; that they went to Boggs's home and had supper; that Liston was ill and was not out of the house till after late breakfast the next morning; that during breakfast DeHart came and had breakfast; that Liston did not go out with DeHart early that morning; that he and DeHart left in the afternoon in the automobile from in front of Boggs's house. He was also corroborated by the colored minister at Slater; that Liston came to his house to arrange for the use of his church for a meeting to organize a local society.

A number of witnesses living in Columbia testified that Liston's general reputation in Columbia for truth and veracity, morality and honesty was good. There was no evidence to the contrary.

The evidence does not show when Liston came to this State. He had been a resident and a member of the bar at Columbia for a year. He must have been admitted to practice law by this court after due inquiry into his character, antecedents, legal attainments and professional standing. He has filed a creditable typewritten brief and argument, prepared by himself while confined in jail. Aside from the testimony of DeHart there is not a word of evidence or circumstance tending to prove that Liston was an accessory before the fact to the crime charged, except that he was in Fayette at the time the crime was committed, and that he hauled the plunder in his car from Fayette to Slater, where the trunk was carried by DeHart and Bug Smith into the latter's house. He remained there a few minutes to warm his hands and inquire where the minister lived and went there at once. Aside from DeHart's evidence, Liston knew nothing of the burglary, was a stranger in Fayette and knew nothing about the contents of the sacks or trunk until he saw the trunk and its contents in the office of Mr. Burton, the prosecuting attorney, when he made his statement a few days before his trial implicating DeHart in the burglary and larceny. In this connection DeHart testified: "I plead guilty yesterday. When Liston made a statement before the prosecuting attorney, that made me mad, and I am getting even with him now." Leaving DeHart's evidence out of consideration, there is not a circumstance in the case that is not consistent with the theory of Liston's innocence of the charge.

DeHart admits convictions for felonies in four states. He swore he testified for the State "to get even with" Liston; that he first met defendant after dark at Sioux City, Iowa, on June 18, 1920; that they

were arrested on a charge of grand larceny that night; that Liston escaped but he, DeHart, was convicted and sentenced to the penitentiary; that while serving his sentence he received a letter from defendant in September, 1925, postmarked at Columbia, Missouri, asking him to come there; that Liston had a job for him; that he and defendant and three others drove to Fayette; had tire trouble near the court house and that while repairing the tire, Liston pointed out the Famous Style Shop and told him to kick it in. DeHart was, so to speak, at home in Fayette, where Liston was a stranger. Other persons were assisting or in the car while the tire was undergoing repairs and DeHart testified that Liston there, for the first time, told him to commit the burglary. The evidence is overwhelming that Liston went to Fayette on an entirely different mission, that he was not with DeHart after the tire was repaired and the party went to Boggs's house, and that Liston was not out of the house or with DeHart until after late breakfast the next morning. DeHart's evidence bears all the earmarks of fiction and of having been inspired by malice.

In State v. Prendible, 165 Mo. 352, 65 S. W. 566, Judge SHERWOOD said:

"Looking at the testimony of Barry and Tierney from every point of view, it seems quite clear that they, and each of them, were guilty of perjury when testifying in this cause; direct, brazen-faced, audacious perjury. But it seems that perjury need not consist of false testimony directly bearing on the issue; it will suffice, it will be deemed material, if it tend, even circumstantially, to the proof of the issue. [2 Archb. (8 Ed.) 1727.]

"And, at common law, it was ground for a new trial, if the witness or witnesses who testified in behalf of the prevailing party were 'shown to be evidently foresworn.' [1 Chitt. Crim. Law (5 Am. Ed.) 656.]

"And under statute (Sec. 2688, R. S. 1899), it is one of the grounds for a new trial that the 'verdict is contrary to the evidence,' and this was one of the grounds alleged in the motion for a new trial. And this statutory ground is clearly comprehensive enough to embrace within its scope, testimony of the character above noted; testimony impeached in all its more prominent features and bearings, for testimony completely impeached is no testimony at all, and no conviction based on such testimony should be permitted to stand when called in question in an appellate court. [People v. Lyons, 51 Mich. 215, 16 N. W. 380; see also, State v. Huff, 161 Mo. l. c. 487, and cas. cit.]

"But in addition to what is above said, this court, in numerous instances, has decided that where a verdict is evidently prompted by prejudice, passion or partiality and is not the result of the calmer weighing of the facts in evidence which should always characterize the deliberations of a jury, it will interfere. [State v. Packwood, 26 Mo.

315 Mo.—83.

340; State v. Brosius, 39 Mo. 534; State v. Mansfield, 41 Mo. 470; State v. Daubert, 42 Mo. 238; State v. Marshall, 47 Mo. 378; State v. Burgdorf, 53 Mo. 65; State v. Jaeger, 66 Mo. 173; State v. Castor, 93 Mo. 242; State v. Primm, 98 Mo. 368.]''

See also State v. Welton, 225 S. W. 965, 968, where Judge WHITE approves the ruling in the Prendible case.

To my mind, when the circumstances are considered, it is apparent that the testimony is of such a character that it is evident that the verdict was prompted by prejudice, passion or partiality, and that in the exercise of a sound discretion a new trial should have been a-warded.

There were affidavits read in support of the motion for new trial by persons having knowledge of the facts stated, that the defendant had an office and was personally present in the city of Indianapolis, as one of the affiants, the assistant city attorney of Indianapolis, deposed, during the first fifteen days of June, 1920; another, Liston's client for whom he was attending to legal business, that Liston was in Indianapolis during the months of May and June, 1920. Other affidavits stated that he was not in Columbia, Missouri, during the month of September, 1925. If any probative force should be conceded to De-Hart's evidence, these affidavits should, of themselves, cast so great a doubt upon the credibility of his testimony as to require a new trial, in the interests of justice. If the defendant was arrested at Sioux City, Iowa, on June 18, 1920, there should be a record of it. If, on a retrial of this case, there should be no additional evidence for the State, the defendant should be discharged. The judgment is reversed and the cause remanded. *Railey, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.