The State v. Robert West, Appellant.—142 S. W. (2d) 468.

Division Two, July 17, 1940.

*I. Joel Wilson* for appellant.

*Roy McKittrick,* Attorney General, and *Max Wasserman,* Assistant Attorney General, for respondent.

564

COOLEY, C.—Appellant, defendant below, was convicted of murder in the first degree for the killing, on June 8, 1938, of Vivian Davidson (hereinafter referred to as deceased), and in accordance with the verdict of the jury, was sentenced to death. He appeals. While the record is voluminous, the legal questions presented for review are few. The defense offered was insanity. Defendant did not testify. It is practically conceded by appellant in his brief here that there was evidence to justify submission to the jury of murder in the first degree. The main contention on this appeal is that the court should also have submitted murder in the second degree, which it did not do.

The State's evidence tended to show the following:

Defendant and deceased had known each other since their childhood, and practically grown up together and attended school together, had kept company with each other after they were old enough, and their respective families were neighbors and on friendly terms. Deceased was about twenty years old at the time of the homicide, defendant about twenty-two or twenty-three. A few years before the homicide defendant had been sentenced to the penitentiary for a robbery (one of several which evidence tends to show he had committed) and had been released, apparently on parole, after serving part of his term. It seems that prior to such sentence defendant and deceased were sweethearts and if not formally engaged at least contemplated marriage with each other. While defendant was in prison deceased married, but lived with her husband only about three weeks, when they separated, due to the husband's failure to provide for his wife, and she returned to the home of her parents, a Mr. and Mrs. Brewer, where she was living at the time of defendant's release from prison and at the time of the homicide. When defendant was released from prison he returned to his parents' home, and it appears deceased and

defendant resumed their former friendly relations. Mrs. Davidson (deceased) had not obtained a divorce from her husband but intended doing so and she and defendant intended to get married. These matters were discussed between them. (There is no evidence of illicit sexual relations between defendant and deceased nor, on the part of the latter, with anyone else.)

About five p. m. on the fateful June 8, 1938, defendant went to the Brewer home, where deceased then lived. As he arrived his cousin, Emil (Ace) Loane and wife drove up in a Ford car and stopped to speak. About that time defendant noticed deceased getting into a Chevrolet car owned by her uncle James Bunton, who was there visiting. The uncle, Bunton, and one Kenneth Buddemeyer, then a stranger to defendant, also got in the Chevrolet car, and they started to drive away. Defendant (stepping on the running board of the car as we understand the evidence) asked deceased where she was going and when she would be back, to which she replied she was going to "Uncle John's" (John Bunton, brother of James and uncle of deceased) and would be back in fifteen or twenty minutes, and those in the Chevrolet drove away. But instead of going to John Bunton's they went to the home of Alice Back, a sister of James Bunton, and all went into the house. The deceased and Buddemeyer in a short time got back into the automobile, with deceased behind the steering wheel. (It seems she was wanting to learn how to drive.)

When deceased thus left her parents' home with her Uncle James and Buddemeyer the Loanes invited defendant to go with them to their home for supper. He went but did not eat supper, saying he had already eaten. They invited him to go with them to a "medicine show" to be given that evening. He agreed to go but said he wanted first to go home and change his clothes and asked to borrow Loane's car for that purpose. Loane consented. Defendant drove to his father's home and asked his father for his (the father's) shotgun. The father asked why he wanted it and defendant said "Me and my cousin are going squirrel hunting." He got the gun and two shells, all the father had. Driving back past John Bunton's home and not seeing the Chevrolet car there he drove on and saw it at the Back place. He saw deceased and Buddemeyer in the Chevrolet car. He stopped, got out of the car he was driving, assembled the shotgun, which it appears he had dismantled or taken apart when he got it from his father, and approached the car in which deceased and Buddemeyer sat. Buddemeyer fled, leaving the car and going into the house. Defendant proceeded to the car in which deceased then sat. As he neared and introduced the gun into the car from the right side (deceased was on the left side under the steering wheel) deceased cried out "Oh, Bob, don't do that" and "put her head down in the seat cushions," but he fired, the charge striking her in the head and killing her. To make sure that she was dead he passed around to the left

side of the car, intending to shoot her again if she had not been killed. Ascertaining that she was dead he tried to kill himself. (This evidence comes from statements and a written confession of defendant, from which it appears the gun barrel was too long for him to reach the trigger when he tried to shoot himself.) Failing in his attempted suicide he threw away the gun and hurriedly left the scene, going to the sheriff's office where he surrendered himself. When Buddemeyer fled from the car he ran into the house, saying "Bob has a gun" or words to that effect and James Bunton ran out and called to defendant, "Don't Bob—don't," and when about six feet from defendant said, "Stop." Defendant had already shot deceased and was apparently reassembling the gun, which had come apart after the fatal shot (details unnecessary, probably for the purpose of killing himself). Defendant shot Bunton, inflicting on him serious, though not fatal, wounds. It was immediately after shooting Bunton that defendant fled the scene and went to the sheriff's office and surrendered.

Defendant made an oral confession at the sheriff's office and also signed a written confession. They substantially correspond. From the written confession we learn some of the facts we have stated above, particularly as to the long and close acquaintance of defendant and deceased and the resumption of their friendship and association after defendant's release from the penitentiary and that they contemplated marriage as soon as deceased could get a divorce from her husband. Coming to the events immediately preceding the homicide defendant said he had seen "Vivian" (the deceased) on June 5th (three days before the shooting). He had been told that Vivian was "going out" with someone, "so I accused Vivian of going out with some fellow, I didn't even know his name and she admitted it, but said she was only joking she didn't intend to go out with him. I said if she did it once she wouldn't do it again," and he took her home, agreeing that he would come to see her on the evening of June 8th (the evening of the homicide). Regarding the events which then transpired he said: "Just before I got to the driveway my cousin . . . Emil Loane and his wife Geneva pulled up in Brewer's driveway and stopped and talked to me. . . . Jim Bunton was in his car which was in the back. . . . Vivian got in with Jim and another fellow got in too, all three of them in the front seat. . . . While they were going out of the driveway I jumped on the running board of their car and asked Vivian when she was coming back, she said she was going to her Uncle John's (brother of James Bunton) and would be back in about 15 minutes. . . . I intended to wait for Vivian but Emil asked me to come home with them and have supper with them, so I got in their car and went home with Emil and Geneva, I stayed there about 15 minutes at their house. . . . I didn't eat with them I had already had supper. They . . . asked me to go to a medicine show with them . . . so I asked them to borrow their car and

used as an excuse I wanted to get on some other clothes to go to the show with them.'' He then detailed how he drove to his father's house, got the shotgun and shells, telling his father he and his cousin were going squirrel hunting, and being asked what was his real reason for getting the gun, said,—''I hadn't made up my mind yet, but I thought I might shoot Vivian, depending on where I found her. If she wasn't with this stranger, I wouldn't have shot her.'' He then described his course from his father's place to John Bunton's and, failing to find the Chevrolet car there, going on to the Back place where he discovered that car, with deceased and Buddemeyer in it, as we have above stated. He said: ''I saw Jim Bunton's car parked in the driveway. . . . Vivian and this stranger, Buddemeyer'' were sitting in the car. ''I drove my car in front of their car and blocked them, so they couldn't pull out of the driveway. Just as I stopped I reached in the back of the seat and got the gun. I stood on the fender and put the gun together and Buddemeyer got out of the car and started toward me and I told him to stay back. . . . He was gone when I had the gun together, I put a shell in the gun and walked over to Bunton's car where Vivian was sitting about in the middle of the car. I walked on the right side of the car and opened the door and she said 'Bob, don't do that.' . . . I poked the gun toward her and she stuck her head over on the seat with her back and side toward me and I fired the gun at her head.'' He then described how he went around to the other side of the car to make sure Vivian was dead, intending to shoot her again if she was not, also intending to kill himself, and how the uncle came out of the house and got shot and about the gun barrel being so long that it frustrated his attempted suicide, as we have above related.

The confession was in the form of questions and answers, taken down by a stenographer. Defendant was asked what was the real reason he shot the deceased. He said: ''She was nagging me all the time and was jealous of me, and because she was with this stranger, when she nagged me about going out with other girls, and I was jealous of her. She didn't want to see me out with anyone else and I didn't want to see her out with anyone else.'' Asked if he ever had trouble with Vivian's husband he said, ''We had words, he wanted her to come back to him but she didn't want to. He told me if I left her alone she would come back. I told him that was up to her if she wanted to come back to him, she could make up her own mind.'' That conversation occurred three or four weeks prior to the homicide.

On behalf of defendant, a physician, Dr. Nelson, of many years' experience, who had specialized in nervous and mental diseases since 1903, testified that in his opinion defendant was mentally irresponsible, in effect insane, at the time of committing the homicide. He had examined defendant thoroughly and had talked with defend-

ant's relatives and others and obtained his history. Dr. Nelson's testimony was lengthy, covering many pages of the transcript and he was permitted to and did detail not only what defendant told him but also what he had learned from others, all of which he took into consideration in forming his conclusion. On the other hand two doctors who, from the record before us, appear to have been equally qualified to speak, testified in substance that they believed defendant was sane and knew right from wrong—knew the nature of the act he was committing—at the time of the homicide. One, Dr. Keaney, a specialist in nervous and mental diseases of long experience, had personally examined defendant a few days after the homicide and heard practically all the testimony at the trial. The other, Dr. Barnes, also heard practically all of the testimony. He too had long experience with nervous and mental diseases, specializing in that line of work. He had not personally examined the defendant but had heard most of the testimony at the trial, all of it that we think could bear upon defendant's mental condition, including the examination and cross-examination of Dr. Nelson, as had Dr. Keaney, and gave it as his opinion that defendant was sane at the time of the homicide. The testimony of all these experts was lengthy, covering a wide range and including all phases that might bear upon the defendant's mental condition. It could serve no useful purpose to detail the reasons upon which they based their respective opinions. Suffice it to say they differed in opinion upon substantially the same facts. It was a question for the jury—as indeed, seems to be substantially conceded.

We have thus, perhaps with some repetition, especially as to what was contained in defendant's confession, epitomized the facts, because of the contention that the court should have submitted murder in the second degree. We have carefully examined the long transcript before us and we are convinced that if there is anything in it to call for submission of that degree of homicide it must be found in what defendant said in his confession, and we are unable to see in what defendant there stated anything that could destroy or evade the element of deliberation necessary to constitute murder in the first degree as distinguished from murder in the second degree, if defendant was sane; and the issue of his sanity *vel non* was submitted to the jury and found, on substantial and sufficient evidence, against him. The instructions on this issue are not here challenged.

Appellant cites State v. Liolios, 285 Mo. 1, 225 S. W. 941; State v. Jackson, 344 Mo. 1055, 130 S. W. (2d) 595; State v. Young, 314 Mo. 612, 286 S. W. 29; State v. Kotovsky, 74 Mo. 247; and several other Missouri cases. We have read and considered these cases. In the Kotovsky case we find a learned discussion of the difference between "premeditation" and the "deliberation" necessary to constitute murder in the first degree. In that case the defendant had killed a woman with whom he was enamored. The defense was

insanity. The defendant was convicted of murder in the first degree and the conviction was affirmed, this court holding that under the facts the offense, if the defendant was sane, was murder in the first degree. The case perhaps most nearly in point as to facts, and on which appellant seems most strongly to rely, is the Liolios case, supra. In that case the defendant shot and killed his wife. Briefly summarizing, it seems from the opinion that the defendant's wife and one Thomas had become enamored with each other, and criminal intimacy had arisen between them. These facts appear to have come to the knowledge of the defendant or at least he had information thereof. Prior to the tragedy he had pleaded with her to cease her association with Thomas. She failed to do so. The defendant and his wife (the deceased) lived at Poplar Bluff. Thomas lived at St. Louis. On the day of the homicide the deceased (wife) apparently determined to go to St. Louis on a train leaving Poplar Bluff that day at about four o'clock P. M. On that day, but as we read the opinion, before he knew of his wife's said intention, the defendant procured a revolver, intending to go to St. Louis to see Thomas. It does not appear from the opinion that he then had any felonious design against his wife. The contrary appears. However, he went to see her in their apartment and found her in traveling clothes, apparently dressed for a trip. He renewed his entreaties to her, pleaded—prayed—with her— to abandon her relations with Thomas, and "finally" she said—"Your prayers don't do you any good; God can't do you any good, don't waste your breath," and told him she was going to St. Louis on a train then about to leave. Thereupon Liolios shot and killed her. This court said that under that testimony there should have been an instruction on murder in the second degree. But it is obvious that there are distinguishing facts between the Liolios case and the instant case. In the Liolios case it was held that, under the facts, especially as shown by the defendant's testimony, there was evidence which required submission of the question whether or not there was that sudden heat of passion which prevented "deliberation," as distinguished from mere "premeditation," differentiating murder in the first degree from murder in the second degree. [See State v. Kotovsky, supra.] In the instant case we can find nothing in the evidence, even in the statements and confession of defendant, giving them the most favorable (to defendant) interpretation, that could be allowed to justify the "heat of passion" necessary to destroy the element of deliberation and reduce the crime, if crime, to murder in the second degree. It seems to us that under the facts of this case defendant is clearly guilty of murder in the first degree or else not guilty at all by reason of insanity, and on the latter issue the jury found against him. Other cases cited by appellant are no more favorable to him than the Liolios case.

A case, cited by respondent, which it seems to us is substantially

analogous in its facts to the instant case, is State v. Barbata, 336 Mo. 362, 80 S. W. (2d) 865. In that case the defendant had killed a young woman with whom he was enamored. The defense was insanity. We held there was no room for submission of murder in the second degree—that under the facts the defendant was guilty of first degree murder or else not guilty by reason of insanity. So we must hold here.

■ Appellant in his brief says the court erroneously failed to instruct the jury "as to the proper punishment under the law and the evidence." So far as we can make out from appellant's brief and his motion for new trial this means only that the court should have submitted murder in the second degree—a contention we have above ruled adversely to appellant. The instructions given by the court properly left it to the jury to say, if they found the defendant guilty of murder in the first degree, whether the punishment should be death or life imprisonment.

■ In his motion for new trial defendant complained that the court erred in failing to instruct the jury that defendant should be acquitted if at the time of the killing he was "obsessed with an insane and uncontrollable impulse to shoot and kill deceased which he could not restrain at the time he shot and killed deceased." This point is not briefed and under recent rulings of this court we would be justified in treating it as abandoned. But owing to the gravity of the case and the sentence imposed we will notice it briefly. The doctrine of "irresistible impulse" as an excuse or defense for crime, at least unless due to a diseased mind—in effect, insanity—is not recognized in Missouri. [See State v. Pagels, 92 Mo. 300, 4 S. W. 931.] The Pagels case has since been cited with approval by this court. [See State v. Miller, 111 Mo. 542, 20 S. W. 243; State v. Soper, 148 Mo. 217, 237, 49 S. W. 1007; State v. Dunn, 179 Mo. 95, 115, 77 S. W. 848; State v. Riddle, 245 Mo. 451, 457-8, 150 S. W. 1044.]

Only one Missouri case has been called to our attention which seems in a way to recognize the "irresistible impulse" doctrine. The case referred to is State v. Miller (Mo.), 225 S. W. 913. That decision is out of line with the otherwise unbroken current of authority in this State, and should no longer be followed, for the reasons stated in State v. Jackson, 346 Mo. 474, 142 S. W. (2d) 45 (No. 36960), handed down concurrently herewith.

We have carefully examined the record and find no reversible error therein. We are constrained to affirm the judgment of the circuit court and order that the sentence be carried into execution. It is so ordered. *Westhues* and *Bohling*, *CC.*, concur.

Date of execution set for August 16, 1940.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.