STATE of Missouri, Respondent,

v.

Carroll Wayne GOACHER, Appellant.

No. 49930.

Supreme Court of Missouri,

Division No. 2.

March 9, 1964.

Robert B. Randolph, St. Joseph, for appellant.

Thomas F. Eagleton, Atty. Gen., Richard R. Nacy, Jr., Sp. Asst. Atty. Gen., Jefferson City, for respondent.

EAGER, Judge.

The defendant was convicted of First Degree Murder and sentenced to life imprisonment. He was represented at the trial by three unusually diligent appointed counsel, and here by one equally so. Since it is actively urged that the evidence was insufficient for such a conviction, we find it necessary to state the somewhat complicated facts in detail.

Sylvester Ralph Puckett, a filling station operator in St. Joseph, sixty-six years of age, was killed in his station at some time between 7:00 a. m. and approximately 8:30 a. m. on November 3, 1961. He was slain by being brutally beaten about the head with a "semi-sharp" instrument, resulting in an "egg-shell" or crushing fracture of the skull with "multiple breaks all over the skull" and visible destruction of brain tissue. The undertaker testified that he counted thirty-three cuts on the victim's head. Mr. Puckett died shortly after reaching a hospital. There was little or no controversy over the fact that the blows were inflicted by a bloody, metal tire tool found by the police on the station floor. The filling station was at the corner of 8th and Monterey Streets. Mr. Puckett had driven his wife from their home to the bus line at 6th and Monterey where he left her about 6:50. She testified that he then had on his person $50 to $60, some in his billfold and some pinned in a shirt pocket, and that after his death she only got back "some little items" and pieces of tobacco. No billfold was found at the hospital.

The defendant lived across the Missouri River bridge in Elwood, Kansas, with his mother, who was a nurse's aid at the Methodist Hospital in St. Joseph. He was 16 years old at the time of the death of Puckett, 17 at trial. Apparently, after defendant reached the sixth or seventh grade, he was transferred to a school for "special education." He had quit school prior to the occurrence in question here. He went to Chicago in October 1961, to look for a job, but had come home about a week

prior to November 3. It was apparently his custom to go from his home to St. Joseph substantially every morning to take his girl friend, Linda Linder, to school; he had no car, getting there by hitchhiking or as best he could; then, if her brother's car was in operating condition, he would drive her to school, otherwise he would "walk" her to the bus stop, about two blocks away. Linda was in the 11th grade. The Linders lived at 2140 South 9th; their home was eight blocks from Mr. Puckett's filling station.

One of the principal controversies arose over the testimony as to the *times* of defendant's various activities on that morning; coupled with this was the fact that "Bud" Linder's car would not start because the starter had been removed. We digest that testimony briefly. Linda testified for the defendant that he arrived at her house about 7:00 o'clock, "walked" her two blocks to the bus corner, and left her. Linda's sister Barbara (put on the stand by the State) testified that defendant came about 7:00, walked Linda to the bus line, and came back about 7:10 or 7:15; that he sat down for a while and then went outside to see about fixing her brother's car, after which he was "in and out"; that he was still around when she sent the "kids" to school about 8:25, and that he left about ten or fifteen minutes before nine. When asked if she had not previously stated that the brother's car (and defendant) were gone about 8:00, she testified that she had been informed by a woman named "Pat" not to tell "exactly what I knew," and not to tell everything. Jerry Blake (produced by the State), who lived just west of the Linders, testified that on November 3, 1961, defendant came to his house "around 7:30 a. m.," for help in starting a car, but that his own battery was down; that they both went across the alley to a garage or repair shop and tried to borrow a booster battery, but were told to come back later; that he, Blake, went home and defendant went back to Linders; that about 8:25 they went back to the shop, got the battery and started Blake's car, whereupon he pushed the Linder car (with defendant driving) and got it started; that he last saw defendant about 8:30.

A driver for Budweiser Distributors, Paul Hill, drove his truck into the driveway of Puckett's station at about 8:30 a. m. He knew Puckett. As he stopped, he first stepped into the interior of the truck to replace some yeast which had fallen down. Either just before or just after he arrived a Mercury car (described variously as green or blue, but nevertheless the Linder car) pulled into the station. While Hill was inside the truck defendant came over and said that "something was wrong with the old man." Hill then saw Puckett standing at the window bleeding, went across the street to "Ross-Frazier's" (an auto supply store) and asked someone there to call the police; he returned, went into the station and tried to help Puckett. He managed to get him seated and tried to check the flow of blood from his head. Apparently defendant waited outside during most of that time, but he may have also been in the station. After a few minutes various police officers arrived; Puckett's head was covered with blood and he was bleeding profusely; he was taken away in an ambulance. Before he left, the police tried to talk to him, but got little response; two of the officers testified that Puckett said to one officer, "Leo, I don't know why he did it"; Paul Hill testified that Puckett said, "I don't know why they * * *." On the floor of the station were two pools of blood; a bloody tire iron was found on the floor in one of these, and there were spots of blood on a vending machine and on the lower part of the front door. Some hair was found on the tire tool. There was some testimony that the cash register was open and disarranged. The police talked to defendant briefly; he stated that he had just come there to get air in a tire, had discovered Puckett's condition, and had asked Paul Hill to call the police because he had no money; no blood was observed on defendant's clothing and the witnesses

disagreed as to whether he seemed nervous or excited. Appellant was then wearing jeans and a rather long, dark jacket.

An employee at "Ross-Frazier's" testified that defendant came there after the ambulance left, wanted his car pushed and, when he heard them discussing Puckett's injury, said, "I hit him on the head," and repeating,—"I hit the old s. o. b. in the head"; also, that defendant's eyes were glassy, and that he had a blank stare. A customer there at the time repeated defendant's statement as,—"I am the guy that killed him." Both hearers were somewhat shocked, and the employee testified that he reported it to his boss, to the detectives who came there, and later to "juvenile authorities." It seems apparent that when defendant finally got the Linder car pushed and started he went back to the Linder house where he stayed a while; at about 11:30 he went to the home of a friend, Gary Proctor, in St. Joseph, still using the Linder car. From this point we take up Gary Proctor's testimony as to the events of that day. Gary was 19 years old and worked nights. He testified that defendant asked him if he knew Mr. Puckett who had been hit in the head, but Gary did not. They went to defendant's home in Kansas, where Gary waited in the car about fifteen minutes; defendant came out with a small pocketbook, some one dollar bills and four or five dollars in change; thence they proceeded to a filling station where defendant bought one dollar's worth of gas; thereafter they went to the "Tin Barn" where Gary made a $10 payment on his car. The crux of Gary's testimony, however, was that enroute to Kansas and on the bridge defendant *"pulled a dark leather billfold out of his left hand coat pocket and threw it out of the car window"* by throwing it up over the top of the car "to the north"; that it *"hit that side railing and glanced off and landed on the bridge."* Gary asked defendant "why" he did this, and defendant said that it was "just an old billfold he found." When they got back to Gary's home they ate lunch, then went

to a filling station in an effort to get a hoist to repair the car; being unsuccessful, they went to the Methodist Hospital where defendant went in to see his mother; he came out in 10–15 minutes, saying that "the old man was dead." Gary left defendant and went to work about 4:00 p. m. He positively identified the billfold produced in evidence as the one he saw defendant have in the car. There was much impeaching testimony to the effect that (among other things) Gary had testified in his deposition that defendant only bought forty-six cents worth of gas with pennies; that it only "looked like" he had thrown something out of the window of the car, and that the police had intimidated him. We note here that the verity of Gary's trial testimony was solely a matter for the jury; and, incidentally, he testified at the trial that *defendant's counsel* had made him "afraid of him" at and just prior to the taking of his deposition. He further testified at the trial that he first went to the police "of my own free will" to tell about the billfold. He later confronted defendant on November 6, when the latter was being questioned by the police. Defense counsel have filed here an affidavit of Gary Proctor supposedly repudiating his trial testimony; this was executed in July, 1963, long after the judgment and sentence; it was never presented to the trial court, and it is of no relevancy whatever here. It is wholly unnecessary to relate all the controversies shown in this voluminous record concerning Gary's testimony.

The billfold introduced in evidence was picked up on the highway bridge by a nonresident traveler; he turned it in to an official at the Port of Entry, who promptly notified the St. Joseph police; they sent over and recovered it on November 3, the date of Mr. Puckett's death. That billfold was positively identified at the trial, not only by Gary Proctor but by Mrs. Puckett.

On November 6, 1961, oral and written confessions were obtained from defendant. We shall not attempt to digest all the testimony dealing with the circumstances of the

confessions. At the trial a lengthy hearing was held outside the presence of the jury in order to determine the admissibility of the confessions. The Court ruled that the confessions were prima facie admissible. Thereafter the substance of the same testimony was submitted to the jury, with some exceptions. For the State this testimony was: that, since defendant was a juvenile, the juvenile officers participated in all such proceedings and that he was eventually "booked" by the juvenile officer; that defendant came in voluntarily on Saturday and Sunday (November 4 and 5) and was questioned, remaining wholly free to come and go, which he did do; that on November 6 he came in by request at about 9:00 a. m. and was intermittently questioned from perhaps around 10:00 until his written statement was completed in the late afternoon; that around noon he was taken to the Highway Patrol station but was promptly brought back, since the desired official was not there; that defendant denied all guilt until confronted by Gary Proctor who told his story, and that soon thereafter defendant orally admitted his guilt; that he was advised of his rights; that no promises or threats were made, no force or duress used, and that he was not denied water, food, toilet facilities, etc.; only one of the several State's witnesses recalled any request by defendant that he be permitted to call his mother; these witnesses testified that defendant appeared normal, not frightened, that no harsh language was used, and that soon after Proctor stated his version of the facts defendant made a rather complete oral confession, followed very shortly by the taking of a stenographic question and answer confession, which was promptly signed by him; and that his signing was wholly voluntary. Several police officers were in and out of the room during this period, along with two juvenile officers, but most of the questioning was done by the Chief of Detectives. Eight officers and the stenographer witnessed the signing of the confession. When defendant made the oral confession, at about the middle of the afternoon, he was "booked" as a juvenile. (He was later released by the Juvenile Court for prosecution, on the basis of his confession.) The Juvenile Officer of Buchanan County was one of the officers present during the questioning, and he testified generally as above indicated; he did testify that he thought defendant asked on one occasion for permission to call his mother. Defendant was interviewed on the evening of November 7, 1961, by Duane Nedrud, an Associate Professor of Law at the University of Kansas City, who specialized in criminal interrogation. Mr. Nedrud testified that, with no one else present, defendant voluntarily told him that Mr. Puckett accused him of burglarizing his place and came at him; that he hit Puckett on the head with a tire iron and kept on hitting him until he fell; that he then took Puckett's billfold and left, but came back to the filling station later. The substance of defendant's written confession was: that he went to Puckett's station shortly after 8:00 o'clock on November 3, 1961, to get some air in a tire and entered the station; that Puckett, whom he did not know, said to him, "You are the little bastard that tried to jump me Thursday night," and then swung at defendant but missed him; that Puckett was between defendant and the door, so he grabbed the tire iron and hit Puckett with it and Puckett fell; that he did not remember whether he struck Puckett while he was on the floor, but that he might have struck him more than once; that he started out the door, but returned and took Puckett's billfold from his trousers' pocket; that he later went back to the station when Hill was there and still later threw the billfold out on the Missouri River bridge; that he only got six or seven dollars.

The defendant testified at length. He detailed his activities on the morning in question, denied the crime, and told specifically of coming to the station with a low tire and of finding Mr. Puckett bleeding. He denied having Puckett's billfold,

denied making the statements of guilt across the street at Ross-Frazier's, and denied the statements to Mr. Nedrud. Concerning his confessions, he testified in substance: that Chief of Detectives Starmer questioned him from about the middle of the morning until the latter part of the afternoon (with a short intermission for the trip to the Highway Patrol), accusing him of the crime, shouting at him, cursing, and saying "I'm going to see you go to the gas chamber or the penitentiary * *," and "We know you did it and you might as well tell us"; that he, defendant, was scared and crying, that every few minutes he asked to call his mother but was never permitted to do so; that Starmer also said (after the confession was written) —"If you do sign it, it will go easier on you"; that Starmer kept telling him about the gas chamber and the penitentiary and that he "got scared" and doesn't know what happened after that; that Maxwell (one of the juvenile officers) also questioned him and said that if he would sign the statement, he would see about his going home; he admitted making oral statements and admitted describing some events in the filling station, but he also testified that he did not remember what he said; finally, he testified that he made statements to keep Starmer from "hollering" at him, and that after the confession was written he was so scared that he did not know what he was signing; also, that "whatever Chief Starmer said—I just followed him," and that he was so scared that he did not know what he said. Defendant's mother and brother saw him at the police station that evening and testified that he was nervous, crying, and upset or "shaken up," and that he kept saying that "he didn't do it."

There was testimony from Mr. Oren Miller, a consultant in guidance for the St. Joseph Schools, that an intelligence test showed that at 14 years and 8 months of age, defendant's mental age was 10 years and 3 months; that test was made about two years before the date of this crime. Another test showed a mental age of 11 and an IQ of 80. Defendant had quit school during or at the end of the 1959–1960 school year. There was no contention of insanity, and this evidence was offered as bearing upon the voluntariness or involuntariness of the confession. In the foregoing lengthy recital we have omitted masses of evidence which we do not deem necessary here.

Although we have determined that this case must be reversed for error in an instruction, there are certain questions which we must rule, in view of another trial. The first of these is the contention that the evidence was insufficient (on any degree of murder, as we understand) to establish the State's case, because its own evidence showed that defendant was "elsewhere" at the time of the crime, because some of the State's evidence was incredible, and because the confession was in direct conflict with the State's other evidence. Essentially, the point is that the State produced Barbara Linder and Jerry Blake whose testimony as to times is said to show that defendant could not have been present when Puckett was murdered. Their testimony has already been digested. It is sufficient to say that the times stated were *estimates*, for no one claimed to have looked at a clock and noted the precise time. In addition, Barbara testified on permitted cross-examination by the State, and in explanation of a statement given to the Prosecutor's representative, that she had been instructed before she was first interviewed "not to tell exactly what I knew." We are wholly unwilling to hold that the State is foreclosed by the time estimates of such a witness. Jerry Blake, in his estimates, left a time gap from a little after 7:30 to approximately 8:15 or 8:20 when defendant was not with him. Counsel also attack as wholly incredible the testimony of Gary Proctor who, they say, was discredited by his deposition testimony and his recent affidavit (which we have said may *not* be considered). The truth of his trial testimony, as well as

that of the other State's witnesses, was for the jury. This is true also of the attacks on the witnesses from Ross-Frazier's who testified to defendant's statements there, and of the testimony of the police officers, whom counsel so freely attack both for their affirmative testimony and for supposed negligence in their investigations. We do not sit here as a jury to weigh evidence. Counsel cite State v. Liston, 315 Mo. 1305, 292 S.W. 45, and State v. Gregory, 339 Mo. 133, 96 S.W. 2d 47. Rarely, indeed, does an appellate court reject the testimony of the State as incredible, and that should only be done where the Court determines that the testimony does not constitute substantial evidence. Gregory, supra; State v. Cohen, Mo., 100 S.W.2d 544; State v. Peterson, Mo., 305 S.W.2d 695. Defendant's confessions, oral and written, placed him in the filling station at the time of Puckett's slaying and directly implicated him. These confessions were direct evidence. State v. Criger, Mo., 46 S.W.2d 537. In so far as counsel claim that the oral testimony of defendant's presence at certain places at certain times was *destructive* of his confession, that again was a matter for the jury. The confession was corroborated by Proctor's testimony of defendant's possession of the billfold, and by defendant's statements to Mr. Nedrud; the State's case was certainly sufficient for submission.

We need spend little time on the point that the confession was inadmissible. Our recital of the facts shows that the evidence, both on the preliminary examination and before the jury, established prima facie that the confessions (oral and written) were voluntarily made. If the evidence concerning the voluntary nature of a confession is conflicting, the question is for the jury. State v. Bridges, Mo., 349 S.W.2d 214; State v. Cochran, Banc, 356 Mo. 778, 203 S.W.2d 707; State v. Perkins, 355 Mo. 851, 198 S.W.2d 704, 168 A.L.R. 920; State v. Laster, Banc, 365 Mo. 1076, 293 S.W.2d 300. The only recent cases cited by defendant (State v.

Butts, 349 Mo. 213, 159 S.W.2d 790, 140 A.L.R. 1177, and State v. Bradford, Mo., 262 S.W.2d 584) were decided on substantially different facts. And the mere fact that defendant was not taken before a magistrate until the morning of November 7 does not render his confession involuntary. State v. Bridges, supra, and cases there cited. The fact, if true, that defendant had a somewhat retarded intellect could not affect the admissibility of his confession upon this evidence, but the jury could and undoubtedly did consider the testimony (which came from one witness only). We note, parenthetically, that defendant's own testimony throughout the case appeared to be very clear, both in his understanding and his expression.

Defendant contends that it was error to submit to the jury a charge of first degree murder, because there was no evidence of "deliberation," citing State v. Liolios, 285 Mo. 1, 225 S.W. 941, and State v. Jackson, 344 Mo. 1055, 130 S.W. 2d 595. In Liolios, the Court discussed the contrasting requirements of "deliberation" and "heat of passion," and merely held that a second degree murder instruction should have been given. Here, such instruction was given. In Jackson, supra, the Court held that the defendant's testimony of the circumstances would, if true, negative deliberation and that a second degree murder instruction was required. In making this contention defendant relies principally upon the written confession which the State introduced, namely, that the confession showed a provocation, an attack by Puckett and, at the most, a killing without deliberation, and not in "cool blood." The State is not conclusively bound by all statements in a confession, nor does it vouch for all such statements. State v. Payne, Mo., 342 S.W.2d 950. The confession was introduced as statements of the defendant, not as judicial admissions by the State. The jury could take or leave any part of it, or all of it. Here, for instance, the jury could believe from the confession and the evidence of de-

fendant's possession of the billfold that defendant killed the deceased, but could have disregarded the extenuating circumstances stated in the confession. The elements here which speak forcibly of deliberation are: first, the fact that Mr. Puckett's skull was almost completely crushed,—an "egg-shell" fracture,—by thirty-three blows on his head; and, second, evidence of the possession of the billfold by defendant, and the fact that the victim's money was gone. The question of *who* killed the deceased in this manner was for the jury, but the very physical nature and the circumstances of Puckett's death were such as to imply and almost force a conclusion of deliberation. It does not necessarily take a day or an hour or even minutes for "blood to cool" so as to justify an inference of deliberation; and a "heat of passion" cannot well be deemed to continue long enough to permit one to strike a victim thirty-three separate blows on the head with a tire iron. Somewhere down the line *deliberation enters.* This may always be inferred from the circumstances. See, generally, State v. Goodwin, Banc, Mo., 352 S.W.2d 614; State v. West, 346 Mo. 563, 142 S.W.2d 468.

As a corollary point defendant complains of that part of the principal instruction defining deliberation; this contained the following: " *  *  * it means an intent to kill, executed by a person in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose, * * *." The phrase "or to accomplish some other unlawful purpose," has been criticized specifically. State v. Sharpe, 326 Mo. 1063, 34 S.W.2d 75; State v. Kauffman, 329 Mo. 813, 46 S.W.2d 843. However, in State v. Hershon, 329 Mo. 469, 45 S.W.2d 60, the use of the term was discussed more fully and criticized, but it was held to be harmless error, and favorable to the defendant. The definition should be recast at another trial.

Instruction No. 7 submitting to the jury the issue on the voluntariness of defendant's confession was as follows:

"A confession of a defendant, either oral or written, if accompanied with proof that the crime was committed by someone, will warrant a conviction if you believe it expresses the truth.

"A confession in order to be considered, must be made voluntarily, that is without anyone holding out any hope *or* reward or leniency or fear of punishment for not doing it. You have a right to consider all the circumstances surrounding and concerning the defendant at the time the confession was made, if you find it was made, in determining the voluntariness of the confession. If you find that it was voluntarily made, it is competent for the jury to consider it and give it such weight as you see fit and proper under all of the circumstances."

Counsel urge that the definition of "voluntarily" was not full and fair in the light of the evidence, particularly in that the evidence showed coercion and "mental duress." Specifically they note: the accusations and threats continuing throughout the day, the supposed shouting and cursing, the denial to defendant of the right to call his mother, the fact that defendant became scared, confused, and did not know what he was doing, that one officer told him he would see about his going home if he signed, and that defendant had the mental age of a ten year old child. We disregard the supposed denial of food, water and cigarettes, because defendant made no point of this in his testimony before the jury, and thus abandoned it as a trial issue. His testimony in the other respects definitely raised an issue of supposed coercion and duress, and that issue was pressed throughout the case. The instruction as given singled out and emphasized "hope of reward or leniency" and "fear of punishment." Nowhere did it mention coercion, duress, intimidation, mental pressure or any equivalent term.

If certain elements, such as "reward" or "fear of punishment" were to be singled out, the instruction should certainly have mentioned specifically the element of *coercion* or duress which was the real issue. Instructions are given for the purpose of hypothesizing the basic factual issues for the jury. In our view this omission was not cured by adding the generality that "You have a right to consider all the circumstances," as was done here.

In State v. Williams, Banc, Mo., 369 S.W.2d 408, a most recent case, the judgment was reversed solely because of the omission of all reference to the issues of mental duress and coercion in a very similar instruction, and in a case where that was a basic issue. There also the instruction referred to "hope of leniency or reward" and it included the phrase "without * * * any threat or doing any violence." The present instruction does not refer to threats. The Court said there, 369 S.W.2d loc. cit. 420: "While, as stated, the evidence on some of these matters was conflicting, the issue was for the jury and the issue of mental duress and coercion had to be decided in order to determine whether the confessions were or were not voluntarily given. No such issue was presented to the jury by Instruction 7 or any other instruction. In omitting to present the issue of mental duress and coercion for determination by the jury, the instruction was clearly erroneous and should not have been given. We find no merit in the other contentions." And there, as here, the age, education, experience and intelligence of the defendant were necessarily involved "when determining whether the confessions were voluntary or coerced." It may also be noted that the defendant did not even testify in that case. And see, also, State v. Deyo, Mo., 358 S.W.2d 816. In the present case the mentality of the defendant was submitted in another instruction. We are hesitant to reverse a case for error in an instruction after a long, arduous, and conscientiously conducted trial, but we cannot disregard

so recent a mandate of our Court on an issue which we deem to be indistinguishable. Moreover, we agree with the ruling there. It is unnecessary to determine whether the Court erred in refusing Instruction "C" on the same subject, as tendered by defendant. It is certainly not in one of the usual forms.

Certain points made in defendant's brief are based upon matters which will presumably not occur on another trial. One of these is the claimed error in permitting certain witnesses to testify in rebuttal; in that, incidentally, the trial court has a wide discretion. State v. Washington, Mo., 320 S.W.2d 565; State v. Dees, Mo., 276 S.W.2d 201; State v. Phillips, Mo., 299 S.W.2d 431. Another point is the alleged error in permitting the State's attorney to cross-examine Barbara Linder, a witness put on the stand by the State. In that matter, also, the trial court had a broad range of discretion, which is to be upheld unless abused. State v. Shelton, 351 Mo. 799, 174 S.W.2d 202, and cases there cited. Counsel have included in their brief a point to the effect that the Court erred in failing to give a manslaughter instruction. No cases are cited nor is the point included in the argument. We deem it abandoned. It should also be noted that any such theory would be wholly opposed to defendant's basic defense of alibi and to his repeated repudiations of his confession; for such an instruction would necessarily be based upon a part of the confession. We find no error in the alibi instruction complained of, and find it unnecessary to discuss that point at length. For the information of counsel, see: State v. Baldwin, Mo., 281 S.W. 940; State v. Dworkin, 307 Mo. 487, 271 S.W. 477; State v. Howe, Mo., 343 S.W.2d 73; and the very recent cases of State v. Bryant, Mo., 375 S.W.2d 107 and State v. Arrington, Mo., 375 S.W.2d 186, No. 49,965, opinions filed on February 10, 1964. The instruction did not shift the burden of proving an alibi to defendant by telling the jury that if, upon consideration of all

the evidence, it had a "reasonable doubt as to the defendant's presence" it should acquit him; it was, of course, to be considered with all other instructions, including the one requiring the State to prove defendant's guilt beyond a reasonable doubt. In State v. Hubbard, 351 Mo. 143, 171 S.W.2d 701, cited by defendant, the language used was wholly different and very clearly cast the burden upon the defendant to prove an alibi defense.

We find it necessary to discuss one other Instruction, No. 4. It was as follows: "The Court instructs the jury that under the law of this state every homicide which shall be committed in the perpetration of or attempt to perpetrate a robbery, is deemed Murder in the First Degree. And in this case, if the jury find and believe from the evidence beyond a reasonable doubt, that a homicide occurred while the defendant was robbing or attempting to rob the deceased Sylvester Ralph Puckett, then such perpetration or attempt to perpetrate such robbery stands in lieu of deliberation and premeditation as hereinbefore defined, and the jury will be warranted in finding the defendant guilty of Murder in the First Degree and should so say in their verdict, however, if you find that the design and intent to commit a robbery, if any, was formed after the striking and beating of the defendant, if any, then you will not find the defendant guilty of murder in the first degree, and will not consider such robbery for any purpose other than as it may tend to prove or disprove the commission by the defendant of the homicide herein charged." This instruction was given on the State's alternative theory of a felony-murder, pursuant to § 559.010, RSMo 1959, V.A.M.S. Defendant insists here: that no robbery was sufficiently proven to justify the instruction (allegedly at most, a larceny from the person), that the instruction did not define robbery leaving the jury to guess at its meaning, and that it constituted a comment on the evidence by a reference to "such robbery." Our previous dis-

cussion indicates that the evidence was sufficient to justify the robbery-murder submission. If defendant had the *intent* to rob, the mere fact that he beat the deceased and knocked him down *before* he took his wallet does not make the crime any less a robbery. State v. Churchill, Mo., 299 S.W.2d 475; State v. Courtney, 356 Mo. 531, 202 S.W.2d 72; State v. Hawkins, Mo., 165 S.W.2d 644. The instruction did not constitute a comment on the evidence by the use of the term "such robbery"; the submission was sufficiently qualified as to leave the occurrence of a robbery, fairly considered, to the jury. The failure to define "robbery" is a more serious question. In State v. Messino, 325 Mo. 743, 30 S.W.2d 750, the Court said that it was unnecessary to define the term; but there the felony relied upon was a bank robbery perpetrated by several armed men who killed a policeman in their escape. There could have been no doubt whatever in that case as to the nature of the act. In State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335, the statement was made that the phrase "attempted robbery" did not need to be defined, citing Messino, but there the term was defined in another instruction and, under the direct and positive evidence of the State, there could have been no doubt that the evidence, if believed, proved a robbery. And see State v. Peak, 292 Mo. 249, 237 S.W. 466; State v. Hart, 292 Mo. 74, 237 S.W. 473. There may have been no necessity for a definition of the term under the facts of those cases, but where as here the facts and circumstances may or may not prove a robbery (as defined in our statutes) depending upon the inferences to be drawn, and the jury is required to find the commission of a robbery if, in fact, it convicts under *that instruction*, then the term should be *defined*. We fail to follow the State's argument that, since the prosecution was not for a robbery as such, the term need not be defined (and see Peak, supra). That is simply a non sequitur. If the State chooses to charge the defendant with the commission of a robbery as

a material element of the first degree murder charge, even upon an alternative theory, then "robbery" should definitely be defined, or all the facts essential to constitute a robbery should be hypothesized. State v. Brown, Mo., 245 S.W.2d 866. Perhaps the latter part of this instruction, including all that part after the word "however," operated to take away the prejudicial effect of the failure to define. That part told the jury, in effect, that if a design and intent to rob was formed after the beating of the "defendant" (deceased), then it would not find defendant guilty of first degree murder (presumably under this instruction only). That wording is somewhat obtuse, and if the instruction is used again it should be entirely recast. We do not hold that the instruction constituted prejudicial error, but it certainly should not be used again in its present form.

For the error in giving Instruction No. 7, the judgment is reversed and the cause is remanded.

All of the Judges concur.